**UNITED STATES of America,**

v.

**Russell A. HARDING, Defendant.**

**No. 03 CRIM. 0316 LAK.**

United States District Court,
S.D. New York.

July 7, 2003.

Deborah E. Landis, Daniel A. Braun, James B. Comey, United States Attorney, for U.S.

Gerald L. Shargel, Henry E. Mazurek, for Defendant.

**MEMORANDUM OPINION**

KAPLAN, District Judge.

Defendant Russell A. Harding, former president of the New York City Housing Development Corporation ("HDC"), is charged with one conspiracy count and three substantive counts relating to a fraud scheme carried out against HDC in violation of 18 U.S.C. §§ 371, 666, 1341 and 1343 and with two counts relating to his alleged possession and receipt of child pornography in violation of 18 U.S.C. § 2252A. The images that underlie the pornography counts, as well as various items of evidence relating to the fraud counts, were seized pursuant to a search warrant. Harding now moves this Court (1) to suppress the evidence seized pursuant to the warrant or in the alternative, (2) for a *Franks* hearing to ascertain whether the government knew or should have known that the confidential source upon whom the government relied, in part, in seeking the warrant was unreliable, (3) to require the use of a questionnaire during *voir dire*, and (4) to compel the government to provide him with a list of known co-conspirators and all documents obtained from the confidential source that were in the government's possession before applying for the search warrant.

*I The Motion to Suppress*

*A. The Investigation and the Warrant Application*

In March 2002, the New York City Department of Investigation ("DOI") began an investigation into the conduct of Harding and Luke Cusack, who previously had been the senior vice president for administration of HDC. In its initial stages, the investigation focused solely on allegations that Harding and Cusack had embezzled money and equipment by, *inter alia*, charging personal expenses to an HDC Diners Club credit card for themselves and

others. The United States Customs Service became involved after allegations were made that Harding had been involved with child pornography.

On May 2, 2002, a Customs Agent submitted to Magistrate Judge Kevin Nathaniel Fox an affidavit in support of warrants to search the apartments where Harding and Cusack resided. The affidavit was based in substantial part on discussions the agent had with DOI investigators and his review of documents obtained from HDC and Diners Club. It related that the DOI investigators had imparted to the agent information obtained by them from witnesses, including a person identified in the affidavit as a confidential source who now is known to have been Fred Sawyers.[1]

### 1. The Allegations of the Affidavit Regarding Fraud

The affidavit, in brief summary, related that HDC had received allegations that Harding had charged to an HDC Diners Club card and otherwise imposed on HDC the cost of various personal expenses, including computers, software, and electronics equipment;[2] that Diners Club bills and other records reflected what appeared to be lavish personal spending on travel and meals; that Harding, upon HDC's receipt of a Freedom of Information Law ("FOIL") request for documents relating to his travel and expenses submissions, instructed his secretary to stop keeping such information on her computer and to begin shredding documents relating thereto; that a witness whose air travel had been charged by Harding to HDC, ostensibly on the ground that the individual had traveled on City Hall business, had informed investigators that he is a personal friend of Harding and that the trip was a purely personal one at Harding's invitation; that Harding had obtained additional compensation that was not approved by HDC's board of directors by means of an unauthorized override of Harding's salary figure in HDC's computerized payroll system; and that, shortly before he resigned, Harding had caused checks for $8,597 and $128,000 to be issued to himself without authority.[3]

The affidavit then went on to describe an interview or interviews of Sawyers by DOI representatives. It stated that Sawyers had said that he had "met" Harding in an Internet "chatroom" in 1998 and maintained an electronic correspondence through September 2001. During that period, Harding sent him gifts of electronic equipment. On at least one occasion, Harding informed Sawyers, electronically, that he "can put both [*i.e.*, the cost of two pieces of electronic equipment sent to Sawyers] on an expense report at work i do it all the time with shit like that ... just one of the perks of being president." Sawyers reportedly provided investigators with what purported to be a copy of that communication. The agent then stated that he had reviewed the printout of the communication as well as shipping documents reportedly obtained from Sawyers, which indicated that the purchaser of the equipment was RA Harding of 175 East 62nd Street, New York, New York, the address of defendant's apartment.[4] He went on to detail additional statements by Sawyers to DOI personnel regarding communications with Harding concerning a trip by Harding on which Harding used

---

1. Shargel Aff. Ex. B (hereinafter "Agent Aff."), ¶ 10.

2. The computers, software, and electronics equipment is listed on Rider B to the agent's affidavit, which appears at Shargel Aff. Ex. A, Rider B.

3. Agent Aff. ¶¶ 11a–11*l*.

4. *Id.* ¶ 11m.

male escorts and Harding's charging of personal expenses to HDC.[5]

Finally, the affidavit related that Harding, after he left HDC, became aware of a renewed FOIL request to HDC, whereupon he repaid to HDC certain personal expenses that he had caused the agency to bear and issued a public statement admitting that he had charged personal expenses to HDC and was prepared to repay them.[6]

### 2. The Allegations of the Affidavit Regarding Child Pornography

The section of the agent's affidavit detailing Harding's alleged involvement in child pornography began with background information concerning the use of computers and the Internet with child pornography.[7] It then turned to information obtained from Sawyers.

According to the affidavit, Sawyers told the DOI investigators that Sawyers had spoken to Harding by telephone on eight to ten occasions and that Harding had used various "screen names," as well as the name "Russ," during their electronic communications. America Online confirmed that Harding was a subscriber and that the screen names given by Sawyers previously were listed for Harding's account. Further, Sawyers told investigators that Harding had sent him photographic images of himself in e-mail messages and provided those images to the

DOI, which compared them with published photographs of Harding and confirmed that they were of the same person. Sawyers, according to the affidavit, provided investigators with copies of envelopes and mailing labels, which bore Harding's home address, from packages that he had received from Harding. Moreover, he described trips, events and activities that Harding described to him in their electronic correspondence. DOI investigators then found such activities documented in expense reports and other documents obtained from HDC. Based on these circumstances, the agent submitted that there was probable cause to believe that Sawyers' electronic correspondent in fact was Harding.[8]

The agent then went on to report that he had reviewed printed copies of e-mail communications that Sawyers provided to DOI investigators.[9] At least one, the agent said, included a transmission by Sawyers' correspondent of an image of a nude prepubescent boy. The correspondent described himself in others as a "pedophile" interested in engaging in sexual activities with young boys and offered to transmit child pornography to Sawyers. The agent then quoted a number of these e-mails. He reported that Sawyers had told DOI investigators that Harding had sent him an additional three to five images of child pornography during the 2000–01

---

5. *Id.* ¶¶ 11n–o.

6. *Id.* ¶¶ 11p–s.

7. *Id.* ¶¶ 13–14[1]. (The affidavit contains two paragraphs number "14." The first is referred to as 14[1] and the second as 14[2].)

   Although the point is not material, this description was at a level with which many, probably most, users of the Internet and personal computers would be quite familiar. It certainly did not indicate that the agent possessed any real technical sophistication. In-

deed, its purpose plainly was to tell the issuing magistrate what little he needed to know, assuming that he had little or no computer or Internet knowledge.

8. *Id.* ¶¶ 14[2]–15.

9. Defendant's moving affirmation suggests that these printed copies were submitted to the issuing magistrate. Shargel Aff. ¶ 6 (description of Exhibit C). Counsel admitted at oral argument, however, that the printed copies were not submitted to Judge Fox. Tr., June 16, 2003, at 21.

period and described at least three images in terms the agent summarized.[10]

Although the agent did not so characterize it, the affidavit focused on the question whether there was probable cause to believe that evidence of crimes involving child pornography would be found in Harding's apartment. The agent noted that he had reviewed a sexually explicit exchange that occurred on May 17, 2001 at about 6:31 p.m. in which the correspondent described what his dog was doing, which suggested to the agent that the correspondent was communicating with Sawyers from his home.[11] Furthermore, the agent took note of the dates and times of all the Internet communications between Sawyers and the correspondent that he summarized, all of which took place during evening hours or on weekends.[12] He noted also that HDC documents indicated that Harding had used HDC funds to acquire desktop and laptop computers, Quicken software, as well as other computers and computer-related equipment.[13] Time Warner Cable had confirmed to the agent that Harding subscribed to Internet service at his apartment, and AOL records demonstrated that an individual using Harding's account had accessed the Internet on May 1, 2002.[14] The agent went on to say, based on his experience in investigating child pornography cases, that collectors of such material typically store them in private secure locations such as their homes and keep them for long periods.[15]

### 3. The Warrant and its Execution

Magistrate Judge Fox issued the warrant on the evening of May 2, 2002.[16] It authorized, *inter alia*, a search of Harding's apartment for a broad variety of documents and electronic media as well as for the computers and other electronic equipment and related materials that Harding allegedly had purchased with HDC funds.[17]

The warrant was executed on May 3, 2002. Agents found a number of items of computer and electronics equipment and related materials that were described in the search warrant, computerized financial records reflecting meals and other purchases of a personal nature for which Harding obtained reimbursement from HDC and, importantly for present purposes, a zip diskette containing still images and a movie file of alleged child pornography.[18]

### B. Suppression

Harding seeks to suppress the evidence obtained pursuant to the warrant on the grounds that (1) the portion of the affidavit relating to the fraud offenses failed to provide a sufficient nexus between Harding's alleged fraud and his apartment—in other words, that it failed to demonstrate probable cause to believe that evidence of the fraud would be found in that location, and (2) probable cause did not exist to search the apartment for evidence of child pornography.[19]

---

10. *Id.* ¶¶ 16–20.

11. *Id.* ¶ 16d.

12. *Id.* ¶ 16.

13. *Id.* ¶ 21; Shargel Aff. Ex. A, Rider B.

14. Agent Aff. ¶¶ 22–23.

15. *Id.* ¶¶ 24–27.

16. Shargel Aff. Ex. A.

17. *Id.* & Riders A & B.

18. Govt. Mem. 11–12.

Neither side has submitted sworn evidence with respect to the manner in which the search and seizure was conducted and the items taken. Defendant, however, does not dispute the government's description in its memorandum of the items seized.

19. Def. Mem. at 1–2, 17–27.

### 1. Probable Cause to Search Harding's Apartment for Evidence of Fraud

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a *fair probability* that contraband or evidence of a crime will be found in a particular place." [20] Probable cause exists if the totality of the circumstances justifies "a person of reasonable caution in believing" that which is sought to be established.[21]

■ The affidavit plainly demonstrated the existence of probable cause to believe that Harding incurred expenses for things such as personal meals, personal travel, and gifts to acquaintances. In some cases, he charged these to an HDC corporate Diners Club card which HDC then paid, and in others he sought reimbursement for expenses he first paid himself. Indeed, Harding concedes that the affidavit "supplied a wealth of probable cause that [Harding] had, in many instances, wrongfully expended funds of" HDC.[22]

As far as the nexus between the crimes and the presence of evidence in Harding's apartment is concerned, the affidavit stated that HDC documents reviewed by DOI investigators indicated that some of the computers and computer-related equipment purchased by Harding with HDC money "was intended for Harding's use at" his residence.[23] Among the computer-related materials allegedly paid for by HDC was Quicken software, which frequently is used to maintain personal financial records.[24] Moreover, "magistrates can make use of their background of experience to determine whether probable cause exists." [25] It is common knowledge that people frequently keep their personal financial records, photographs of personal travel, personal computers and related materials, personal correspondence, and date books or calendars in their homes.

Harding nevertheless argues that finding probable cause to believe that evidence of the fraud was in his apartment would be "the equivalent of issuing a general warrant—'authorizing searches of **any** property owned, rented or otherwise used by a criminal suspect,' " at least in financial fraud cases.[26] To be sure, special care must be taken with respect to the issuance of warrants to search personal residences. But Harding's argument both implicitly overstates the extent of the protection afforded by the Fourth Amendment and understates the strength of the showing made to Judge Fox.

■ The probable cause inquiry "focuses on the relation of criminal conduct to a particular location and not on the activities of any particular person." [27] But there is no need for "direct evidence linking the residence to criminal activity ... to establish probable cause.... Instead, probable

---

**20.** *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (emphasis added); *accord United States v. Canfield,* 212 F.3d 713, 718 (2d Cir.2000).

**21.** *United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990).

**22.** Def. Mem. 1.

**23.** Agent Aff. ¶ 21.

**24.** Shargel Aff. Ex. A, Rider B.

**25.** *United States v. Scharfman,* 448 F.2d 1352, 1355 (2d Cir.1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 944, 30 L.Ed.2d 789 (1972).

**26.** Def. Mem. 18 (quoting *United States v. Schultz,* 14 F.3d 1093, 1098 (6th Cir.1994) (emphasis in original)).

**27.** *United States v. Burton,* 288 F.3d 91, 103 (3d Cir.), *cert. denied,* 537 U.S. 1039, 123 S.Ct. 575, 154 L.Ed.2d 461 (2002).

cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband [or evidence] at the home of the" subject of an investigation.[28]

The evidence before Judge Fox afforded ample basis for concluding that there was a fair probability that materials described in the warrant would be found in Harding's apartment. As Harding concedes, there was plenty of evidence indicating that Harding had HDC foot the bill for personal expenses, including travel and personal meals, and that he had taken computers and computer-related materials paid for by HDC for use at his residence. The computer-related materials paid for by HDC included software that can be used to maintain personal financial records. In these circumstances, there was every reason to believe that a search of his residence would turn up documentation of personal expenses and reimbursement therefor, date books and photographs confirming the travel and meals and probably their personal nature, and similar evidence, not to mention the computers and computer-related equipment. In any case, reliance on this aspect of the warrant was "objectively reasonable."[29] Accordingly, so much of the motion as seeks to suppress evidence of the fraud offenses seized during the search of Harding's apartment must be denied.

### 2. Probable Cause to Search Harding's Apartment for Evidence of Child Pornography

Harding's attack on the aspect of the warrant authorizing a search for evidence of child pornography offenses is two-pronged. He begins by asserting that the affidavit provided no basis for concluding that the confidential source (Sawyers) was credible. Second, he maintains that the source's information was not substantially corroborated by law enforcement personnel.[30] The attack, however, fails at each stage.

A judge evaluating the adequacy of a search warrant application may consider hearsay, including the hearsay statements of a confidential informant, in determining the existence of probable cause.[31] As a general proposition, a determination of probable cause based upon information supplied by an informant depends, at least in part, upon an assessment of its reliability. "Information may be sufficiently reliable ... if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence."[32] If corroboration is required, corroboration of material aspects of the information is sufficient to warrant crediting the entire account.[33] This principle, however, is not without its exceptions. Information provided by a crime victim or other citizen witness may be accepted even absent a proven track record of reliability or corroboration.[34] In other words, the

---

**28.** *Id.; see also United States v. Riley,* 906 F.2d 841, 845 (2d Cir.1990).

**29.** *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

**30.** Def. Mem. 20–25.

**31.** *See, e.g., Jones v. United States,* 362 U.S. 257, 269–71, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Smith,* 9 F.3d 1007, 1013 (2d Cir.1993).

**32.** *United States v. Wagner,* 989 F.2d 69, 72–73 (2d Cir.1993).

**33.** *Id.* at 73.

**34.** *E.g., United States v. Rowell,* 903 F.2d 899, 903 (2d Cir.1990); *United States v. Vassiliou,* 820 F.2d 28, 30 (2d Cir.1987).

requirement of prior reliability or corroboration is addressed to the "particular problem of professional informers." [35]

█ The government seeks to bring itself within the crime victim-witness line of cases and thus argues that there is no need to address the question whether Sawyers' statements were sufficiently corroborated.[36] The question whether its effort is persuasive is a close one. On the one hand, Sawyers certainly was not the sort of "professional informer" of which Judge Friendly wrote in *Burke*. On the other hand, he was not a crime victim, and his own involvement in child pornography arguably made him more a participant than a witness.[37] But there is no need to resolve this issue here in light of the ample evidence of corroboration of Sawyers' statements.

In this case, the affidavit made clear that the confidential source was known to law enforcement and thus liable to repercussions if he misinformed the DOI. He was a participant in the alleged child pornography offenses and so likely to be knowledgeable about the pertinent facts.[38] The affidavit related that Sawyers' statements concerning his correspondent's use of screen names was corroborated by America Online, which confirmed that Harding had an account and that the screen names Sawyers disclosed to agents in fact were listed for Harding.[39] It advised the magistrate judge that the source had turned over copies of envelopes and mailing labels from packages sent to the source by the correspondent that bore Harding's name and residence address.[40] It noted that activities described in e-mails that the source claimed to have received from Harding corresponded with some of Harding's activities as documented in HDC records.[41] And it then went on to describe printed copies of e-mails, apparently from Harding, which demonstrated that the source's correspondent was involved with child pornography and, in one case, described the correspondent's activities in a manner indicating that he was communicating with the source from his home.[42]

**35.** *United States v. Burke*, 517 F.2d 377, 380–81 (2d Cir.1975).

**36.** The government does not suggest that the affidavit established a proven track record of reliability.

**37.** *But see United States v. Gaviria*, 805 F.2d 1108, 1115 (2d Cir.1986) (stating that information provided by a criminal participant or witness may be accepted absent proof of the informant's track record of reliability); *United States v. Rueda*, 549 F.2d 865, 869–70 (2d Cir.1977) (holding that information provided by participant in crime may be accepted without demonstration of prior reliability, at least in circumstances where evidence does not suggest that informant had motive to incriminate other participants).

**38.** Agent Aff. ¶¶ 16–17.

**39.** *Id.* ¶ 15.

**40.** *Id.*

**41.** *Id.*

**42.** *Id.* ¶ 16.

Harding argues that there is at least one respect in which the affidavit is inaccurate and thus does not reflect that the agent corroborated Sawyers' statements. The affidavit described DOI agents' confirmation of Harding's identity by comparison of published photographs of Harding with images that Sawyers' correspondent attached to e-mail messages sent to the source. Agent Aff. ¶ 15. Harding asserts that one of the photographs provided by Sawyers was published in, among other sources, HDC's annual report. Def. Mem. 7. He asserts that the other photograph is not a photograph of him. Shargel Ltr. June 10, 2003. Even if this were true, the affidavit describes ample other ways in which the source's account of Harding's in-

Harding argues that the "glaring omission" in this list of corroborating facts "is the lack of any mention of child pornography." [43] But he is incorrect. The affidavit recited that the agent had reviewed printed copies of e-mails to Sawyers from his correspondent, one of which transmitted and discussed an image of a nude, prepubescent boy and in others of which the correspondent "expressly described himself as a 'pedophile' who is interested in engaging in sexual activities with young boys" and in which "he offer[ed] to transmit child pornography to the" source. [44] The agent then quoted and described e-mails and described arguably pornographic images that Harding sent or offered to send to the source. [45] Thus, there was no shortage of corroboration of the source's account of Harding's involvement in child pornography. [46]

Harding's contention that the magistrate judge's reliance on the printouts of the electronic messages was inappropriate fails to undermine this conclusion. To be sure, none of the printouts of Internet "chat sessions" or e-mails bore a manuscript signature. They ultimately might prove to have been, in whole or in part, phony. And, as Harding argues, there is no suggestion that law enforcement personnel examined the source's computer to learn whatever might thus have been learned as to the provenance of the printouts. The bottom line, however, is that documentary evidence of all sorts is subject to falsification, manipulation, and forgery. The ultimate question before Judge Fox was whether

the application, considered in a practical manner, established a fair probability that Harding was engaged in child pornography offenses and that evidence thereof would be found in his apartment. The question for this Court is even narrower in view of the deference that must be accorded to his conclusion. This Court holds that Judge Fox "had a substantial basis for the finding of probable cause." [47] In any case, the agents had an objectively reasonable basis for relying on the warrant issued by the magistrate judge. [48]

■ Finally, the Court is persuaded that the motion to suppress the child pornography evidence would fail in any case because the agents inevitably would have discovered it in executing the portion of the warrant that sought evidence with respect to the alleged fraud.

The roots of the inevitable discovery doctrine lie in *Silverthorne Lumber Co. v. United States.* [49] The facts were straightforward. Federal agents entered the defendant's office "without a shadow of authority . . . and made a clean sweep of all the books, papers and documents found there." [50] The district court ordered the return of the evidence, but the government served subpoenas to produce the originals. The defendant refused to comply and was held in contempt. In reversing the contempt conviction on the ground that the government could make no use of the illegally seized evidence because it was fruit of a poisonous tree, the Court, in frequently quoted language, observed:

volvement in child pornography was corroborated.

43. Def. Mem. 23.

44. Agent Aff. ¶ 16.

45. *Id.* ¶¶ 16a, 16c, 17.

46. Harding argues also that the affidavit was insufficient because it failed to indicate that the agent did anything else to corroborate the

source's account. Def. Mem. 23. The short answer is that no more was required.

47. *Wagner,* 989 F.2d at 72.

48. *Leon,* 468 U.S. at 922, 104 S.Ct. 3405.

49. 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

50. *Id.* at 390, 40 S.Ct. 182.

"Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." [51]

Thus, where the government obtains evidence both from lawful and unlawful sources, the evidence is admissible because "it can be said that the fruit not only grows from the poisonous tree, but also grows from another, non-poisonous tree." [52]

In *Nix v. Williams*,[53] the independent source rule led directly to the inevitable discovery doctrine. In *Nix*, the police questioned the defendant in violation of his right to counsel and, as a result, learned the whereabouts of a murder victim's body. Although the location of the body would have been suppressible as the product of a violation of the Sixth Amendment, the Supreme Court nevertheless held it admissible because a search party, independently and methodically scouring a defined expanse, was only a couple of miles from the body at the time of the illegal

questioning and inevitably would have discovered it within the next several hours.[54] In rejecting the defendant's contention that his conviction should be reversed because the trial court erred in denying his motion to suppress the body and all related evidence, the Court reasoned that the purpose of the exclusionary rule is to deter law enforcement misconduct by ensuring that the government not be placed in a better position by reason of any illegality.[55] But it went on to say that there is no justification for putting the government in a worse position than it "would have been in absent any error or violation." [56] In consequence, it held, the illegally obtained evidence would not be suppressed because the government had established "that the information ultimately or inevitably would have been discovered by lawful means— here the volunteers' search." [57] It added that "the deterrence rationale has ... little basis" in these circumstances.[58]

The inevitable discovery doctrine has received little subsequent treatment by the Supreme Court,[59] and *Nix* and its progeny understandably left a good many questions unanswered.[60] For present purposes, the most significant is whether and in what

**51.** *Id.* at 392, 40 S.Ct. 182.

**52.** Robert M. Bloom, *Inevitable Discovery: An Exception Beyond the Fruits*, 20 Am. J.Crim. L. 79, 80 (1992).

**53.** 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

**54.** *Id.* at 449–50, 104 S.Ct. 2501.

**55.** *Id.* at 442–43, 104 S.Ct. 2501.

**56.** *Id.* at 443, 467 U.S. 431.

**57.** *Id.* at 444, 450, 104 S.Ct. 2501.

**58.** *Id.* at 444, 104 S.Ct. 2501.

**59.** *See, e.g., Murray v. United States*, 487 U.S. 533, 539, 108 S.Ct. 2529, 101 L.Ed.2d 472

(1988) (describing inevitable discovery doctrine as "an extrapolation from the independent source doctrine"); *New York v. Quarles*, 467 U.S. 649, 671 n. 4, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (citing with approval inevitable discovery doctrine).

**60.** R. Bradley Lamberth, *The Inevitable Discovery Doctrine: Procedural Safeguards to Ensure Inevitability*, 40 Baylor L.Rev. 129, 136 (1988); *see generally* 5 Wayne R. LaFave, Search and Seizure § 11.4(a), at 240–53 (3d ed.1996); Robert M. Bloom, *Inevitable Discovery: An Exception Beyond the Fruits*, 20 Am. J.Crim L. 79 (1992); Steven P. Grossman, *The Doctrine of Inevitable Discovery: A Plea for Reasonable Limitations*, 92 Dick. L.Rev. 313 (1988); Note, *The Inevitable Discovery Exception, Primary Evidence, and the Emasculation of the Fourth Amendment*, 55 Fordham L.Rev 1221 (1987).

circumstances the doctrine applies where, as here, the constitutional violation is of the Fourth Amendment's warrant requirement rather than of the Sixth Amendment, as in *Nix.*

The problem is simply put. In *Nix,* the improper questioning of the defendant was entirely independent of the active search for the body that the Court found inevitably would have led to the evidence at issue. While excluding the evidence would have deterred the police to some extent from engaging in improper questioning, the fact that the evidence inevitably would have been obtained by independent investigative means already under way meant that exclusion would have had the unacceptable result of placing the government in a worse position than it would have occupied had the questioning not taken place. The social costs of exclusion in such circumstances, the Supreme Court held, thus vastly would have exceeded the modest benefits of added deterrence.[61]

■ The calculus, some have argued, is different in the Fourth Amendment warrant requirement context. The Fourth Amendment requires that probable cause determinations be made by a neutral and detached judicial officer, not by law enforcement officials. Hence, some courts have held that a warrantless search cannot later be justified on an inevitable discovery theory because such a rule "would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment."[62]  Law enforcement officials would have an incentive to dispense with an application to a neutral magistrate whenever they believe that they can demonstrate probable cause after the fact. In consequence, exclusion in such circumstances arguably would serve the deterrent function to an extent greater than would have been the case in *Nix.* But any contention that *Nix* should not apply where the illegality is a warrantless search is foreclosed in this Circuit.

In *United States v. Whitehorn,* the Court of Appeals held, albeit without discussion of the possibility that exclusion is more appropriate in warrantless search cases than it was in *Nix* because it could deter officials from ignoring the warrant requirement,[63] that the inevitable discovery doctrine prevented suppression of evidence obtained in an illegal warrantless search.[64]  And it reaffirmed that view in *United States v. Cabassa,*[65] although that was a case in which it found that the requirements of the doctrine were not satisfied.

The applicability of the inevitable discovery doctrine in this case is even more justified than in *Whitehorn.* If inevitable discovery will defeat a motion to suppress the fruits of a warrantless and therefore unlawful search, certainly it must defeat such a motion addressed to the fruits of a lawful, warranted search, albeit a search for other materials. In such a case, there is no misconduct to deter. So the only

---

**61.** *Nix,* 467 U.S. at 444, 104 S.Ct. 2501.

**62.** *United States v. Griffin,* 502 F.2d 959, 961 (6th Cir.), *cert. denied,* 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974); *accord United States v. Mejia,* 69 F.3d 309, 319–20 (9th Cir.1995); *United States v. Buchanan,* 904 F.2d 349, 357 (6th Cir.1990); *United States v. Echegoyen,* 799 F.2d 1271, 1280 n. 7 (9th Cir.1986); *United States v. Satterfield,* 743 F.2d 827, 846–47 (11th Cir.1984), *cert. denied,*

471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985).

**63.** *See Leon,* 468 U.S. at 919, 104 S.Ct. 3405 (quoting *United States v. Peltier,* 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

**64.** 829 F.2d 1225, 1230–31 (2d Cir.1987), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988).

**65.** 62 F.3d 470, 473–74 (2d Cir.1995).

remaining question is whether the agents inevitably would have discovered the pornographic materials on Harding's zip disk in executing the portion of the warrant that sought materials relating to the fraud allegations.

The relevant portion of the warrant authorized a search of Harding's apartment for, *inter alia:*

"cassettes, . . . computer disks, . . . data disks, . . . magnetic media floppy disks, . . . and other computer related operation equipment . . . which may be, or are used to . . . (b) create, store, or maintain records relating to scheduling, travel, financial activities, and expenses, including financial documents, bank statements, credit card records, . . . electronic calendars, address books, diaries, and date books as well as the data within the aforesaid objects relating to said materials,"

"[d]ocuments, records, and other materials reflecting personal financial information and expenditures . . ."

and

"[d]ocuments, records, and other materials reflecting personal and business travel, including but not limited to photographs . . ." [66]

Thus, the warrant clearly authorized the agents to search for zip disks and to determine whether they contained evidence relating to the fraud. In fact, Harding does not contend otherwise. Rather, he asserts that the search of the disks for such information should have stopped short of opening and viewing the contents of the particular files that proved to contain the child pornography:

"[T]he executing officers in this case should have been able to determine what kind of material each computer file contained without having to open the file, according to the indication in the file directory of the file type, *i.e.,* whether the file was labeled as a 'TXT' file, meaning text file, or 'JPG' or 'GIF,' denoting a graphical image file." [67]

The assertion is supported by an affidavit of a computer expert, who stated that:

"In my experience file content can *generally* be discerned by the file extension allocated to a file. Electronic files with a textual content often bear the extension 'txt' and application log files bear the extension 'log'. The most common file extensions for electronic files with still graphical content are 'jpg' or 'gif'." [68]

The key word, however, is "generally."

Prior to the argument of the motion, the Court issued an order proposing to take judicial notice of certain technological facts pertinent to this issue.[69] The parties consented.[70] In consequence, the Court hereby notices the facts set forth in the order and, on that basis, finds as follows:

1. "JPEG" is an acronym for Joint Photographic Experts Group.

2. JPEG refers to a data compression method that can reduce the size of digital data files beneath their uncompressed sizes.

3. JPEG is referred to also as JPG.

4. JPEG compression frequently is used to compress graphic as opposed to text data files.

5. Text may be converted into a graphic data file by optical scanning.

**66.** Shargel Aff. Ex. A, Rider A, ¶¶ 1(b), 20, 21.

**67.** Def. Reply Mem. 8.

**68.** Shargel Aff. Ex. G, Ashley Aff. ¶ 7 (emphasis added).

**69.** Order, June 13, 2003.

**70.** Tr., June 16, 2003, at 2–3.

6. Graphic data files containing images of textual material may be created, or converted into, JPEG files and stored in that format.

7. Files stored on personal computers each have file names.

8. In DOS, various versions of Windows, and other operating systems, file names typically are in the format [*file name* ].XXX.

9. The portion of the file name following the period and indicated in paragraph 8 by the characters XXX is referred to as a file extension.

10. The file extension may consist of any three or, in some operating systems, more letters.

11. By convention, files often are assigned file extensions suggesting the nature of their contents. For example, WordPerfect and Word, two commonly used word processing programs, normally assign the file extensions "wpd" and "doc," respectively, to documents created by them. Similarly, graphics files created or saved in the JPEG format normally are assigned names that include the file extension "jpg."

12. Notwithstanding the conventions referred to in paragraph 11, personal computers typically allow a user to assign any desired three letter file extension to any file, regardless of the nature of the content of the file.

13. A personal computer user could assign file names including file extensions, such as "jpg," that conventionally are used to indicate graphic data files to files that contain text.

These findings demonstrate that the conclusion Harding would have the Court draw from his expert's rather equivocal opinion concerning determination of file content would be unwarranted for either of two independent reasons.

First, while it doubtless is true that file extensions "generally" or conventionally indicate the nature of the content of the files to which they are assigned, that is not uniformly true. Files containing graphical images may be assigned file extensions, including "TXT", that typically are assigned to text files. Files containing text may be assigned file extensions, including "JPG" or "GIF", that typically are given to graphical image files.[71] Hence, the agents who executed the warrant could not have determined simply from the file names and extensions that the files on the zip disk that contained the alleged child pornography did not contain text or other material relevant to the fraud allegations. They could have done that only by opening and inspecting the contents of the files, without regard to the file extensions they bore.

Second, even if file extensions were unequivocally indicative of the nature of the files' contents (i.e., even if a "JPG" or "GIF" extension necessarily indicated that the file contained only graphical images), the agents still would have had to open and inspect the zip disk files in order to determine whether they contained evidence of the alleged fraud. Text files containing such evidence are readily scanned and converted into graphical image files.[72]

---

71. It should be noted that the parties have agreed that the two computers seized from Harding's apartment both ran Windows operating systems. Letter, Deborah E. Landis and Daniel A. Braun, June 17, 2003.

72. Defendant seeks to avoid this conclusion through his expert's surreply affidavit, which states that computer forensic investigators typically use software programs known as "carving" utilities to identify files according to type, rather than opening individual files because an individual's home computer may contain hundreds of thousands of files. Def. Ex. A, Ashley Aff. (June 13, 2003) ¶¶ 1–3. Ashley states further that carving programs identify the nature of files by reading header

Finally, there is still another reason, independent of the facts of which the Court has taken judicial notice, that buttresses the government's inevitable discovery argument. The fraud evidence for which the government was authorized to search included photographs of personal and business travel. Photographs may be taken with digital or film cameras.[73] In either case, they may be stored in digital form in graphical image files, although they first must be optically scanned if they initially are captured on film. Hence, even the warrant's authorization of the search for the photographs relating to the fraud allowed the agents to open and inspect the contents of the graphical image files on the zip disk.[74]

The Court holds that the portion of the warrant authorizing a search for evidence related to the fraud allegations permitted the agents to search for zip disks and to open and inspect their contents. In consequence, even if probable cause was lacking for the portion of the warrant directed at the pornography allegations, and even if the agents were unjustified in relying on that portion of the warrant, the motion to suppress the contents of the zip disk nevertheless would have to be denied because the agents inevitably would have discovered their contents in the proper execution of the other portion of the warrant.

## II. Franks *Hearing*

Harding moves in the alternative for a hearing under *Franks v. Delaware*[75] to challenge claimed inaccuracies or omissions in the search warrant affidavit.

■ To be entitled to a *Franks* hearing, a defendant must make a "substantial pre-

---

information and "do not rely on file names or extensions to distinguish the file type." *Id.* ¶ 3.

Ashley's affidavit does not alter the result. The assertion that "computer forensic investigators typically utilize" carving programs does not mean that agents would have been obliged to do so. Furthermore, the alleged pornographic material was found on a zip disk, rather than Harding's hard drive. Defendant's expert does not contend that it would be impractical or atypical to open each file on a zip disk given that its storage capacity is far smaller than a typical personal computer hard drive.

**73.** The use of the word "photograph" to describe an image captured with a digital camera or stored in digital form may be a misnomer. "Photography" typically refers to the process of capturing images by "producing a negative or positive image directly or indirectly on a sensitive surface by the action of light or other form of radiant energy." WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1702 (1963). This perhaps excludes what commonly is referred to as digital photography. But the point is academic. Search warrants must be read in a common sense way. *See, e.g., Steele v. United States,* 267 U.S. 498, 503–4, 45 S.Ct. 414, 69

L.Ed. 757 (1925). This warrant authorized a search for images of personal and business travel, regardless of whether they were made or stored in digital or conventional photographic form.

**74.** Harding's reliance on *United States v. Carey,* 172 F.3d 1268 (10th Cir.1999), is not helpful to him. Def. Reply Mem. 9–10. In that case, an agent executing a search warrant for computer files for drug-related evidence found and opened a number of JPG files containing images of child pornography. 172 F.3d at 1270–71. The Court found that the pornographic images should be suppressed because the agent admitted that, after he found the first image of child pornography, which was labeled with a sexually suggestive title, he deliberately switched from his authorized search for drug-related evidence to this subject. *Id.* at 1273–74. Here, no evidence has been put forth suggesting that the agents knew in advance of opening the files on the zip disks which files related to the fraud versus the child pornography. Moreover, Harding overlooks the fact that the fraud evidence for which the government was authorized to search included photographs of personal and business travel.

**75.** 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

liminary showing" that: (1) the claimed inaccuracies or omissions in the search warrant affidavit are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding.[76] In order to warrant a hearing, a defendant's "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."[77] An inaccuracy that is the result of negligence or innocent mistake is insufficient.[78] Furthermore, "[i]f after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the [ ] court need not conduct a *Franks* hearing."[79]

Harding alleges that Castro omitted from his affidavit that: (1) Sawyers had "an actual bias against [ ] Harding as a result of [ ] Harding's decision to terminate their three-year cyber-relationship after [ ] Harding told [ ] Sawyers that they could not meet in person;" (2) Sawyers "decided to publicize his scorn for [ ] Harding and obtain notoriety for his information in the public media while cooperating with government agents;" (3) computer printouts provided by the source were unreliable;[80] and (4) one of the photographs provided by Sawyers to DOI representatives is not a photograph of Harding.[81] Harding alleges that Agent Castro knew or should have known all of the preceding "facts" and that their omission was material to Judge Fox's finding of probable

cause.[82] He argues further that Agent Castro deliberately or recklessly omitted these alleged "facts" from his affidavit.

There is little case law concerning the "reckless disregard" standard in the search warrant context. The *Franks* Court failed to flesh out the standard directly, though it stated that information put forth in an affidavit must be "appropriately accepted by the affiant as true."[83] Judge Chin, following Third and Eighth Circuit precedent, recently held that omissions from search warrant affidavits " 'are made with reckless disregard if an officer withholds a fact in his ken' that 'any reasonable person would have known [ ] was the kind of thing the judge would wish to know.' "[84] Embedded in this standard is the requirement that the affiant knew or, presumably, had reason to know the fact that she or he omitted. Thus, the preliminary issue to be resolved is whether Harding has shown that Agent Castro knew or had reason to know the "facts" he omitted from the search warrant affidavit. If these facts indeed were "in his ken," the following question is whether they were the sort of facts a reasonable person would know a judge would want to know. Alternatively, Harding must show that Agent Castro deliberately omitted the alleged facts. And even if Harding satisfies this burden, he must show also that Judge Fox would not have found probable cause had he been apprised of them.

■ Turning to the first omitted "fact," Harding alleges that Castro knew or

**76.** *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir.1998) (citing *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir.1987)).

**77.** *Franks*, 438 U.S. at 171, 98 S.Ct. 2674.

**78.** *Id.*

**79.** *Id.*

**80.** Def. Mem. 30.

**81.** Shargel Ltr. June 10, 2003.

**82.** *Id.*

**83.** *Franks*, 438 U.S. at 165, 98 S.Ct. 2674.

**84.** *United States v. Perez*, 247 F.Supp.2d 459, 474 (S.D.N.Y.2003) (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir.2000) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir.1993))).

should have known, based on an article published in *The Village Voice*, that Sawyers harbored bias against him.[85] Even assuming the article's characterization of Sawyers' motivation to be true, it is not clear that this is something a reasonable person would know a judge would want to know. It no doubt is commonplace for confidential informants to have strong feelings concerning the subjects of their disclosure—this surely often motivates them to come forward with information. Furthermore, Harding has not shown that Sawyers' alleged bias would have made him more likely to provide untruthful, as opposed to truthful, information concerning Harding. Finally, it seems unlikely that inclusion of this detail would have altered Judge Fox's probable cause finding in light of the ample other details included in the search warrant affidavit.

Harding's second claimed ground for a *Franks* hearing—Agent Castro's omission of the fact that Sawyers sought "notoriety" in coming forward with information about him—fares no better. As an initial matter, it is not clear that Castro knew or should have known this alleged "fact." Harding points to no evidence in support of this allegation, and one published account suggests that Sawyers was reluctant to divulge his identity publicly.[86] Even assuming Castro knew or should have known that Sawyers sought notoriety, it does not necessarily follow that this would color his testimony and therefore was not necessarily the sort of information a judge would want to know. Finally, it is far from clear that Judge Fox would have altered his probable cause determination had he known this alleged "fact."

The third omission Harding relies upon is the alleged "fact" that Sawyers provided "apparently fabricated" printed copies of "chat" logs to *The Village Voice*.[87] This claim fails for the simple reason that there is no evidence that Castro knew or should have known about the "apparent[ ] fabricat[ion]" in the chat logs published in *The Village Voice* article or any alterations of any other printed copies of Internet chats or e-mail messages provided by Sawyers. The article in *The Village Voice*, which noted that a chat log printed in an earlier article contained a reference to an event that had not yet taken place, was published three weeks after Castro submitted his search warrant affidavit, so Castro could not have been on notice about the alleged inconsistency from this source.[88] Moreover, the Court finds that Castro had no reason to notice the anomaly in the chat log, which related to former President Clinton's opening an office in Harlem, considering that the inconsistency escaped the notice of an investigative reporter and his editors and was not the sort of detail one would expect an agent to focus upon in these circumstances. Furthermore, it should be noted that Castro did not even reference or include the chat in question in his search warrant affidavit.

Harding argues further that "[i]f the agents were in possession of inconsistent or apparently false information on printed copies of Internet 'chats' or E-mail messages provided by [ ] Sawyer [sic] ... this information should have been communicated to the magistrate." [89] The assertion is supported by an affidavit of a computer expert who concluded, based on

---

85. Def. Mem. 30 (citing Shargel Aff. Ex. D., Tom Robbins, *The Lush Life of a Rudy Appointee*, The Village Voice, Apr. 10–16, 2002).

86. Shargel Aff. Ex. D., Tom Robbins, *The Lush Life of a Rudy Appointee*, The Village Voice, Apr. 10–16, 2002.

87. Def. Mem. 30.

88. Shargel Aff. Ex. F, Tom Robbins, *Bonus Baby*, The Village Voice, May 22–28, 2002.

89. Def. Mem. 30.

inconsistencies in formatting of the first line of information on the chat logs and on the use of a different typeface and spacing in a March 18, 2000 chat log,[90] that all of the paper copies of chat logs referenced in the search warrant affidavit are "not authentic." [91] Furthermore, the expert demonstrated the ease with which he could alter graphical electronic data, such as America Online screen shots, and concluded that he had doubts as to the authenticity of the screen shots referenced in the search warrant affidavit.[92]

It may be easier to manipulate computer files than handwritten or other non-computer generated documents. Nevertheless, even if the expert is correct that the chat logs and screen shots he reviewed were altered, the subtle inconsistencies he identified are not of a type that one would expect an agent to notice in these circumstances. As the Supreme Court has recognized, every fact recited in a search warrant affidavit need not be correct because "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." [93] Harding has cited no authority for the proposition that an agent in Castro's position was required to conduct the detailed analysis the expert performed before relying on documentary evidence in a search warrant affidavit. Accordingly, the Court need not reach the questions whether Castro omitted this "fact" recklessly and whether the omission was necessary to Judge Fox's finding of probable cause.

Finally, Harding contends that Castro deliberately or recklessly omitted from the affidavit the "fact" that one of the pictures provided by Sawyers to DOI representatives is not a photograph of Harding.[94] Castro's affidavit asserted that Harding "attached photographic images of himself to E-mail messages that he sent to the CS which the CS, in turn, provided to DOI representatives" and that DOI representatives confirmed, by comparing those images to published photographs of Harding, that those photographs depict Harding.[95] Harding's attorney has submitted a letter asserting that one of "the photograph[s] given by the CS to New York City investigators is *not* a photograph of Russell Harding." [96]

The opinion of Harding's attorney that the photograph is not of Harding even if correct, is not enough to raise an issue of fact as to whether the agent deliberately or recklessly failed to alert the magistrate that the photograph was not of Harding. Absent some other evidence, there is no reason to believe that any error, if error there was, was anything but a mistake insufficient to raise a *Franks* problem.[97] Thus, Harding has failed to sustain his burden of showing the need for a *Franks* hearing concerning this or any of the other omitted "facts" he cites.

### III. Voir Dire

Harding requests that the Court use a jury questionnaire to elicit prospective jurors' attitudes concerning, *inter alia,* homosexuality and child pornography in order to evaluate their ability to serve fairly and impartially in this case. The Court is aware that some of the issues

---

90. Shargel Aff. Ex. G, Ashley Aff. ¶¶ 10–14.

91. *Id.* ¶ 24.

92. *Id.* ¶¶ 17–23, 25.

93. *Franks,* 438 U.S. at 165, 98 S.Ct. 2674.

94. Shargel Ltr. June 10, 2003.

95. Agent Aff. ¶ 15.

96. Shargel Ltr. June 10, 2003.

97. *See United States v. Bellomo,* 954 F.Supp. 630, 641–42 (S.D.N.Y.1997)

likely to arise in this case may be regarded as sensitive by some prospective jurors. Nevertheless, Harding has failed to demonstrate that use of a *written* questionnaire is necessary or preferable to a proper *voir dire* conducted by the Court.

"[F]ederal judges have been accorded ample discretion in determining how best to conduct the *voir dire.*"[98] In this case, Harding has failed to demonstrate that use of a written questionnaire is necessary to elicit honest and frank responses from prospective jurors concerning their ability to be fair and impartial when evaluating evidence concerning, for example, child pornography and homosexuality.[99] Less cumbersome means exist to safeguard the *voir dire* process, such as excluding the public from questioning concerning these issues. Thus, in all the circumstances, Harding's request for use of a jury questionnaire is denied.

### IV. Discovery Requests

Harding moves also to compel discovery of (1) the identity of the unnamed co-conspirators referred to in count one of the indictment,[100] and (2) all documents obtained from Sawyers that the government had in its possession prior to applying for the search warrant.[101]

■ As for defendant's first request, Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to apprise him of the charges with sufficient precision so as to enable him to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."[102] A bill of particulars is not, however, a general investigative tool for the defense as "the prosecution generally need not particularize all of its evidence, so long as the defendant is adequately informed of the charges against him."[103] Whether to grant a bill of particulars rests within the sound discretion of the district court.[104]

■ A district court should deny a request for a bill of particulars "if the information sought by defendant is provided in

---

**98.** *Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

**99.** Indeed, many of the cases defendant cites to support his request for use of a jury questionnaire involved anonymous juries and thus are inapposite. *See, e.g., United States v. Gambino,* 809 F.Supp. 1061, 1068 (S.D.N.Y. 1992) ("[T]he Court will use a comprehensive jury questionnaire to ensure that both the Government and defense counsel will have 'an arsenal of information' about each potential juror containing 'responses to questions concerning his own life, as well as his attitudes about the issues that would arise in the case' and, therefore, the parties will be able to intelligently exercise their challenges for cause and peremptory challenges.") (quoting *United States v. Barnes,* 604 F.2d 121, 142 (2d Cir.1979)); *United States v. Muyet,* 945 F.Supp. 586, 595 (S.D.N.Y.1996) (jury questionnaire to be utilized to select anonymous jury); *United States v. Giampa,* No. S 92 Cr. 437(PKL), 1992 WL 295983, at *6 (S.D.N.Y.

Oct. 16, 1992) (jury questionnaire used for anonymous jury).

**100.** Def. Mem. 34; Shargel Aff. Ex. I.

**101.** Def. Mem. 34; Tr., June 16, 2003, at 54 (clarifying that motion sought only documents in government possession before the search).

**102.** *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987); *see also Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545 (1927); *United States v. Ahmad,* 992 F.Supp. 682, 684 (S.D.N.Y.1998).

**103.** *United States v. Lino,* No. 00 Cr. 632(WHP), 2001 WL 8356, at *3 (S.D.N.Y. 2000); *see also United States v. Persico,* 621 F.Supp. 842, 868 (S.D.N.Y.1985) (collecting cases).

**104.** *E.g., United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir.1984).

the indictment or in some acceptable alternate form." [105] The Second Circuit has cautioned, however, that the prosecution does not fulfill its obligations "merely by providing mountains of documents to defense counsel who were left unguided" as to the nature of the charges pending. [106]

■ Here, the indictment describes in sufficient detail the nature of and acts alleged to have been committed in furtherance of the conspiracy charged in count one to permit Harding to prepare his defense, avoid unfair surprise and enable him to dispel any concern regarding his exposure to future prosecution for the same offense. Furthermore, in September 2002, months before Harding was indicted, the government provided defense counsel with detailed information identifying numerous expenditures of HDC funds that, in the government's view, were attributable to Harding's unlawful conduct. In the time since the indictment, it has furnished more than 12,000 pages of discovery materials that are indexed to enable cross-referencing with the specific acts charged. [107] In light of these considerations and the relatively straightforward nature of the conspiracy alleged, Harding is not entitled to identification of co-conspirators. [108]

■ Harding's second request—for all documents the government obtained from Sawyers before it sought the search warrant—also is denied. Harding requests these materials under Fed.R.Crim.P. 16(a)(1)(E)(i) on the theory that they are "material to the preparation of the defense's pretrial motion to suppress the evidence seized by the government in its search of Mr. Harding's apartment." [109] As discussed earlier, Harding failed to sustain his burden under *Franks v. Delaware* to make a substantial preliminary showing that he is entitled to a hearing concerning whether Castro knowingly or with reckless disregard for the truth made material false statements or omissions in his search warrant affidavit. Absent that showing, Harding is not entitled to wide-ranging discovery to canvass for evidence in support of his motion to suppress. Accordingly, the discovery request is denied.

### Conclusion

For the foregoing reasons, Harding's motion is denied in all respects.

SO ORDERED.

---

105. *Bortnovsky*, 820 F.2d at 574.

106. *Id.* at 575.

107. Braun Aff. ¶ 2–3; Gvt. Mem. 34–35.

108. This case is thus distinguishable from many of those cited by Harding in which courts have required a bill of particulars due to the complexity of the charges and the paucity of information and/or the unwieldiness of the documents provided to the defendant. *E.g., United States v. Nachamie*, 91 F.Supp.2d 565, 570–73 (S.D.N.Y.2000) (requiring government disclosure of names of any known unindicted co-conspirators where alleged conspiracy involved large number of participants over significant period of time and government produced more than 200,000 pages of documents relating to Medicare claims but failed to inform defendants which of the claims were false and in what way); *United States v. Lino*, No. 00 Cr. 632(WHP), 2001 WL 8356, at *12 (S.D.N.Y.2000) (requiring bill of particulars where twenty-three defendants were charged in twenty-six counts with RICO offenses and various conspiracies and where the government had produced 570,000 pages of documents and more than 1,200 hours of recorded conversations).

109. Shargel Aff. Ex. I, Shargel Ltr. May 8, 2003, p. 2.