[Cite as *State v. Scott*, 2020-Ohio-5575.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                 CASE NO. 9-20-05

      v.

JEREMY SCOTT,                           O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 19-CR-106

Judgment Affirmed

Date of Decision:   December 7, 2020

APPEARANCES:

    *Ted Coulter* for Appellant

    *Nathan R. Heiser* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Jeremy Scott ("Scott"), appeals the January 21, 2020 judgment of sentence of the Marion County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On February 28, 2019, Deputy Jesse Allen ("Deputy Allen") of the Marion County Sheriff's Office requested a warrant to use a thermal-imaging device to scan a residence located at 552 Pearl Street, Marion, Ohio. In the affidavit supporting his request for the search warrant, Deputy Allen stated that, based on years of tips regarding Scott's involvement in marijuana cultivation, a trash pull, subpoenaed records of electricity usage at 552 Pearl Street, and other information, he had probable cause to believe that Scott was running a marijuana growing operation out of 552 Pearl Street and another residence, 354 Chestnut Street, Marion, Ohio. Deputy Allen's request for a search warrant was granted, and on the night of March 1, 2019, 552 Pearl Street was scanned with a helicopter-mounted thermal-imaging device. With the results of the thermal-imaging scan in hand, on March 6, 2019, Deputy Allen requested warrants to search 552 Pearl Street and 354 Chestnut Street. The search warrants were granted, and on March 7, 2019, 552 Pearl Street and 354 Chestnut Street were searched. The two searches yielded nearly 200 marijuana plants, significant quantities of harvested and processed marijuana, and growing equipment, including 20 grow lights and 10 electrical ballasts.

{¶3} On March 20, 2019, Scott was indicted on three counts: Count One of illegal manufacture of drugs or cultivation of marihuana in violation of R.C. 2925.04(A), (C)(5)(d), a second-degree felony; Count Two of illegal manufacture of drugs or cultivation of marihuana in violation of R.C. 2925.04(A), (C)(5)(d), a third-degree felony; and Count Three of illegal manufacture of drugs or cultivation of marihuana in violation of R.C. 2925.04(A), (C)(5)(e), a third-degree felony.[1] (Doc. No. 2). On March 25, 2019, Scott appeared for arraignment and pleaded not guilty to the counts of the indictment. (Doc. No. 6).

{¶4} On April 29, 2019, Scott filed a motion to suppress evidence. (Doc. No. 14). On May 8, 2019, the State filed a memorandum in opposition to Scott's motion to suppress evidence. (Doc. No. 18). On August 23, 2019, Scott filed an amended motion to suppress evidence. (Doc. No. 42).

{¶5} The hearing on Scott's suppression motions was held over two separate days in August and September 2019. (*See* Aug. 30, 2019 Tr. at 7); (Sept. 26, 2019 Tr. at 7). At the suppression hearing, Scott's primary argument for suppression was that in the affidavits used to secure the three search warrants, Deputy Allen knowingly and intentionally included false or inaccurate statements or included such statements with reckless disregard for their truth or inaccuracy. He maintained

---

[1] Due to a clerical error, Count Three was originally charged as a second-degree felony. The trial court later granted the State's motion to amend the indictment to reflect that Count Three should have been designated as a third-degree felony. (Doc. Nos. 80, 95).

that when the allegedly false or inaccurate statements are removed from the affidavits, the affidavits do not contain information sufficient to establish probable cause for any of the searches. In addition, Scott claimed that the affidavits could not support a probable-cause determination for any of the searches because much of the information contained in the affidavits was stale by the time the warrants were issued. On October 10, 2019, the trial court denied Scott's suppression motions, finding that Scott did not prove that Deputy Allen inserted false or misleading statements in the search-warrant affidavits intentionally or with reckless disregard for the truth. (Doc. No. 73).

{¶6} On December 3, 2019, pursuant to a negotiated plea agreement, Scott pleaded no contest to Count One of the indictment. (Doc. No. 93). In exchange, the State agreed to recommend dismissal of Counts Two and Three of the indictment. (*Id.*). The trial court accepted Scott's no contest plea and found him guilty. (Doc. No. 100). In addition, the trial court dismissed Counts Two and Three of the indictment. (*Id.*).

{¶7} On January 17, 2020, the trial court sentenced Scott to four years in prison. (*Id.*). The trial court filed its judgment entry of sentence on January 21, 2020. (*Id.*).

{¶8} On February 19, 2020, Scott filed a notice of appeal. (Doc. No. 105). He raises three assignments of error for our review, which we address together.

**Assignment of Error No. I**

**Trial court erred as a matter of law, abused its discretion and erred against the weight of the evidence when finding defendant-appellant failed to prove by a preponderance of evidence that false statements or inaccurate statements were made knowingly or with a reckless disregard for truth in order to acquire a search warrant to conduct a fly over thermal imaging test over a residence that the defendant-appellant was allegedly using at 552 Pearl Street, Marion, Ohio.**

**Assignment of Error No. II**

**Trial court erred as a matter of law, abused its discretion and erred against the weight of the evidence when finding defendant-appellant failed to prove by a preponderance of evidence that false statements or inaccurate statements were made knowingly or with a reckless disregard for truth in order to acquire a search warrant for a residence known as 354 Chestnut Street, Marion, Ohio that the defendant-appellant was living [sic].**

**Assignment of Error No. III**

**Trial court erred as a matter of law, abused its discretion and erred against the weight of the evidence when finding defendant-appellant failed to prove by a preponderance of evidence that false statements or inaccurate statements were made knowingly or with a reckless disregard for truth in order to acquire a search warrant a residence [sic] known as 552 Pearl Street, Marion, Ohio in which the defendant-appellant was allegedly using [sic].**

{¶9} In his assignments of error, Scott argues that the trial court erred by denying his motions to suppress evidence. Specifically, Scott argues that competent, credible evidence does not support the trial court's determination that Deputy Allen did not include false or misleading information in the search-warrant

-5-

affidavits intentionally or with reckless disregard for the truth. Moreover, Scott maintains that, regardless of whether the affidavits contain false or misleading information, the information in the affidavits is too stale to support findings of probable cause.

{¶10} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶11} The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Probable cause 'means less than evidence which would justify condemnation,' so that only the 'probability, and not a prima facie showing of

criminal activity is the standard of probable cause.'" *State v. Gonzales*, 3d Dist. Seneca Nos. 13-13-31 and 13-13-32, 2014-Ohio-557, ¶ 18, quoting *State v. George*, 45 Ohio St.3d 325, 329 (1989).

> In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*George* at paragraph one of the syllabus, quoting *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317 (1983). Generally, "neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause." *Id.* at paragraph two of the syllabus, citing *Gates*. "In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, * * * appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *Id.*, citing *Gates*.

**{¶12}** "'There is * * * a presumption of validity with respect to the affidavit supporting [a] search warrant.'" *State v. Jackson*, 9th Dist. Lorain No. 14CA010593, 2015-Ohio-3520, ¶ 10, quoting *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674 (1978). Yet, "search-warrant affidavits are not unassailable." *State v. Bingham*, 3d Dist. Allen No. 1-18-71, 2019-Ohio-3324, ¶ 18. Under *Franks v. Delaware*, a defendant may challenge a facially valid search-warrant affidavit by proving that "'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit * * *.'" *Id.*, quoting *Franks* at 155-156. "'Reckless disregard' means that the affiant had serious doubts of an allegation's truth." *State v. Waddy*, 63 Ohio St.3d 424, 441 (1992), *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997), citing *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984). "Omissions count as false statements if 'designed to mislead, or * * * made in reckless disregard of whether they would mislead, the magistrate.'" *Id.*, quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990). However, with respect to omissions, some courts have concluded that "'except in the *very* rare case where the defendant makes a strong * * * showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, * * * *Franks* is inapplicable to the omission of disputed facts.'" (Emphasis sic.) *State v. Blaylock*, 2d Dist. Montgomery No. 24475, 2011-Ohio-4865, ¶ 15, quoting *Mays v. Dayton*,

134 F.3d 809, 816 (6th Cir.1998); *State v. Bangera*, 11th Dist. Geauga No. 2015-G-0021, 2016-Ohio-4596, ¶ 62-64.

**{¶13}** When a *Franks* hearing is conducted, "the defendant must * * * prove by a preponderance of the evidence that the affiant intentionally or recklessly included a false statement in the affidavit or, in the case of an omission, excluded critical information from the affidavit with the intention to mislead." *Bingham* at ¶ 21, citing *Franks* at 156 and *Blaylock* at ¶ 15-16. "If the defendant meets his burden of proof, the court must then redact the false statement from the affidavit or introduce the omitted information into the affidavit." *Id.* "If the affidavit's content with the false statement removed or with the omitted information included is insufficient to support a finding of probable cause, 'the search warrant must be voided and the fruits of the search warrant excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *Id.*, quoting *Franks* at 156 and citing *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405 (1984).[2]

---

[2] As an aside, we note that the proceedings in this case do not appear to have been conducted in the manner contemplated in *Franks*. To be entitled to a *Franks* hearing, a defendant must both make a "substantial preliminary showing" that a false statement was intentionally or recklessly included in the search-warrant affidavit *and* demonstrate that the allegedly false statement is necessary to the probable cause determination. *Franks* at 155-156. If the defendant fails on either count, "the Fourth Amendment does not require a special evidentiary hearing to review the validity of the search warrant." *Bingham* at ¶ 20, citing *State v. Roberts*, 62 Ohio St.2d 170, 178 (1980). Here, it seems that the trial court proceeded to conduct a full evidentiary hearing without first requiring Scott to make a substantial preliminary showing that Deputy Allen intentionally or recklessly inserted false statements into the affidavits. Although this deviation from the procedure outlined in *Franks* is certainly not fatal to the trial court's decision, in order to preserve valuable judicial resources, we encourage trial courts to hew to the procedures outlined in *Franks* as much as is practicable in cases such as this.

{¶14} On appeal, Scott argues that nearly every paragraph of each of the three search-warrant affidavits contains a materially false or misleading statement that Deputy Allen included intentionally or with reckless disregard for the truth. To streamline our analysis, we divide the statements into three general categories: statements common to all three affidavits, statements specific to the affidavit for the thermal-imaging scan, and statements common to the affidavits for 552 Pearl Street and 354 Chestnut Street or specific to the affidavit for 354 Chestnut Street.

{¶15} We begin with statements common to all three affidavits. These statements fall into four categories: pre-2019 information, information about a January 2019 traffic stop, information about electricity usage at 552 Pearl Street as compared to other properties, and information about the qualifications and experience of Special Agent Andrew Webb ("Agent Webb"), who assisted Deputy Allen during the investigation. We address each of these categories in turn.

{¶16} Each of the three search-warrant affidavits at issue in this case features 11 identical paragraphs containing information about Scott's alleged involvement with marijuana and marijuana cultivation during the period from September 8, 2000 through June 4, 2015. Most of these paragraphs relate tips given to law enforcement officers by informants. In addition, some of the paragraphs touch on information discovered by law enforcement officers while investigating these tips as well as other relevant information that came to the attention of law enforcement officers

through other means. The following paragraphs are representative of the information contained in these 11 paragraphs:

Since September 08, 2000[,] when Jeremy Scott was arrested for possession of marijuana[,] there have been multiple tips called in on him. Jeremy has been stopped in multiple traffic stops and caught with various grow equipment as well.

On August 31, 2008[,] Rita Miley called in a tip stating that she has a child with Jeremy and that the child made a statement saying that Jeremy is growing and selling weed.

* * *

On January 26, 2015[,] unknown caller reported that her grandchildren have told her about some drug houses. Children stated that 178 Leader Street is a drug house that nobody lives in, 345 [sic] Chestnut Street is a drug house that nobody lives in and the owner lives at 552 Pearl Street where he has a safe full of money there along with guns and mean dogs. All of these houses were owned by Laureen Strunk who is Jeremy Scott's mother according to the female on the tip line.

* * *

On March 03, 2010[,] a traffic stop occurred with Jeremy Scott as the driver. Jeremy was operating a grey Chevy Cavalier * * *[.] [D]uring the traffic stop[,] the officer smelled the odor of marijuana and later searched the car to find items related to a small growing operation. These items included fluorescent lights, marijuana leaf clippings, starter tray and an empty soil bag.

On May 21, 2015[,] MARMET pulled trash at 552 Pearl Street and located multiple items that show Jeremy Scott appears to be growing at this address. Located in the trash was mail that had Jeremy Scott's name on it, marijuana leaves, and an Ohio Edison bill for 354 Chestnut Street, a bill ledger, and a plastic baggie with marijuana inside of it.

(Defendant's Exs. 7, 10, 13).

{¶17} Scott claims that these 11 paragraphs contain various falsehoods and misrepresentations. He also maintains that critical information has been omitted from many of them. For example, with respect to the paragraphs relaying the tips law enforcement officers received from various informants, Scott argues that Deputy Allen should have had serious doubts about the truth of the information contained in these tips because some of the tips came from anonymous informants, "the most unreliable of tipsters," and others came from named informants who "ha[d] an animus against [him]." (Appellant's Brief at 8-9). In addition, Scott

contends that some of the information contained in these 11 paragraphs is so incredible as to be obviously false and that, as a result, Deputy Allen could not have reasonably believed in the truth of such information. (*See id.* at 8-10).

{¶18} Scott's arguments are without merit. After reviewing the record, we conclude that, with limited exceptions, Scott failed to prove that the information contained in these 11 paragraphs was false or that critical information was omitted from any of them. To the extent that Scott did prove the existence of misstatements or inaccuracies within these 11 paragraphs, the record supports that such misstatements or inaccuracies were the product of honest mistakes on the part of Deputy Allen. However, "[a]llegations of negligence or innocent mistake are insufficient" to invalidate a search-warrant affidavit under *Franks*. *Franks*, 438 U.S. at 171.

{¶19} Furthermore, concerning Scott's claims about the credibility of the informants, "the subject of [a *Franks*] hearing is the veracity of the affiant, not of persons on whom he justifiably relied." *United States v. Barone*, 787 F.2d 811, 814 (2d Cir.1986). Provided that Deputy Allen's reliance on these informants was reasonable, the fact that these informants might have lied does not supply a basis for invalidating the search warrants. *See State v. Stebner*, 46 Ohio App.3d 145, 148 (11th Dist.1988) ("[A]s long as the affiant-police officer believed the information was true and his belief was reasonable, the warrant's validity was not affected by

the fact that the informant may have lied about the information which formed the basis of the search warrant."). In this case, there is nothing in the record indicating that Deputy Allen's reliance was unreasonable. We recognize that tips from anonymous informants are generally less reliable than tips received from named informants and that tips received from allegedly biased persons should be regarded with some suspicion. However, the tips in this case mutually corroborated one another, and they were independently corroborated to some degree by law enforcement officers. Furthermore, contrary to Scott's assertion, none of these tips is so outlandish as to render belief in their truth unreasonable.

{¶20} Next, each of the three affidavits also contains a paragraph detailing a January 2019 traffic stop that helped to revive the investigation into Scott's suspected marijuana growing operation. This paragraph provides, in relevant part:

> On January 16, 2019[,] Jeremy Scott was stopped in a traffic stop * *
> *. The vehicle was searched and in the trunk a grow light and
> amplifier was [sic] found.

(Defendant's Exs. 7, 10, 13).[3]

{¶21} Scott argues that this paragraph contains false information because "[t]he report from the stop does not mention anything about [him] having a grow

---

[3] Although this paragraph is identical in the affidavit for the thermal-imaging scan and in the affidavit for 552 Pearl Street, this paragraph contains one additional sentence in the affidavit for 354 Chestnut Street. In the affidavit for 354 Chestnut Street, this paragraph also provides that Scott's "vehicle was seen leaving the 300 block of Chestnut Street near where [Scott was] living." (Defendant's Ex. 10).

light and amplifier in his car." (Appellant's Brief at 10). However, Scott fell short of proving that the information contained in this paragraph was false. At the suppression hearing, Deputy Allen testified that although he was not personally involved with the stop, he spoke to an investigator who he "believe[d] was present at the stop." (Aug. 30, 2019 Tr. at 115-116). According to Deputy Allen, this investigator informed him that a grow light and amplifier were discovered in the trunk of the vehicle that Scott was driving. (*Id.* at 116). Therefore, although the grow light and amplifier were not mentioned in the police report of the incident, there is evidence supporting that these items were in fact discovered in Scott's trunk. Moreover, assuming that these items were not actually located in Scott's trunk, there is nothing in the record suggesting that Deputy Allen would have known or had reason to know of that fact. On this record, we believe that Deputy Allen's reliance on the information given to him by the investigator was entirely reasonable. *See State v. Henderson*, 51 Ohio St.3d 54, 57 (1990) ("'Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.'"), quoting *United States v. Ventresca*, 380 U.S. 102, 111, 85 S.Ct. 741 (1965).

{¶22} In addition, the three affidavits each feature paragraphs detailing electricity usage at 552 Pearl Street as compared to similar properties. In these paragraphs, Deputy Allen explained that after the grow light and amplifier were

-15-

found in Scott's vehicle during the January 2019 traffic stop, he "requested a subpoena for the electrical records for the property at 552 Pearl Street and also for two properties on the same street with a similar but slightly larger square footage, to be used as a comparison." (Defendant's Exs. 7, 10, 13). 552 Pearl Street is approximately 1577 square feet, whereas the comparison houses are approximately 1644 and 1788 square feet. (Defendant's Exs. 7, 10, 13). Deputy Allen stated that in his "training and experience[,] a property that contains an indoor marijuana grow contains equipment * * * that requires a large amount of electricity to use, therefore the electric bill to the property should be significantly higher than the electric bill at the comparison properties." (Defendant's Exs. 7, 10, 13). The subpoenaed records revealed that, from December 2017 through January 2019, 552 Pearl Street used 27,011 kilowatt hours. (Defendant's Exs. 7, 10, 13). By comparison, during the same period, 231 Pearl Street, the 1644 square foot house, used 5,103 kilowatt hours and 189 Pearl Street, the 1788 square foot house, used 2,909 kilowatt hours. (Defendant's Exs. 7, 10, 13). Deputy Allen noted that the subpoenaed records "showed a significantly higher usage of electricity on the target property compared to the 2 comparison residences" and that the comparison "shows that this is a high electricity usage for the property which is consistent with the usage of high wattage indoor equipment needed in an indoor marijuana growing operation." (Defendant's Exs. 7, 10, 13).

{¶23} With respect to these paragraphs, Scott maintains that Deputy Allen misled the issuing judges by (1) using a "form or 'template' to prepare the affidavit"; (2) misrepresenting his law enforcement experience; and (3) failing to disclose that one of the comparison houses was a duplex and that the other was vacant. (Appellant's Brief at 10-12). Scott argues that Deputy Allen "did not tell the Court that he used a form for the creation of the affidavit and that much of the affidavit was not even his own words." (*Id.* at 11). In addition, he claims that by failing to disclose that "he had only been a law enforcement officer for 3 years and had only been on the MARMET Drug Task Force for 194 days," Deputy Allen misrepresented that he "had experience and education/training as to narcotics investigations when he did not." (*Id.* at 10-11). Finally, Scott argues that Deputy Allen failed to disclose that one of the comparison houses was a duplex and that the other was vacant, thereby distorting the comparisons and leading the issuing judges to believe that 552 Pearl Street used much more electricity than similar properties when in fact it did not. (*Id.* at 10-12).

{¶24} With respect to Scott's first argument, under the facts of this case, it is not significant that Deputy Allen failed to inform the issuing judges that he used a template to draft the search-warrant affidavits. An "'affidavit is [not] invalid to support a search warrant simply because it ha[s] a preprinted format * * *.'" *United States v. Garcia*, 528 F.3d 481, 486 (7th Cir.2008), quoting *United States v. Romo*,

-17-

914 F.2d 889, 898 (7th Cir.1990). "As long as there is sufficient information to provide probable cause for the search, the fact that the affidavit is partially pre-prepared is irrelevant." *Romo* at 898. Thus, it is immaterial whether Deputy Allen used a "form" affidavit or whether he disclosed that fact; what matters is whether the averments in the affidavits were accurate to the best of Deputy Allen's knowledge and whether those averments supported findings of probable cause.

{¶25} Furthermore, contrary to Scott's argument, the record does not establish that Deputy Allen misrepresented his law enforcement experience or that he omitted details about the length of his law-enforcement service in order to mislead the issuing judges. At the suppression hearing, Deputy Allen testified that, in addition to his initial training at the law enforcement academy, he completed additional training with other members of the MARMET task force when he was assigned to the task force. (Aug. 30, 2019 Tr. at 60). In addition, Deputy Allen completed at least one training module specific to narcotics investigations. (Doc. Nos. 10, 13). Although Deputy Allen did not mention that he had been a law enforcement officer for only three years and a member of the MARMET task force for less than a year, the record does not support that Deputy Allen misrepresented his qualifications or that he made statements about marijuana growing operations that exceeded the scope of his training and experience.

{¶26} Finally, we consider whether competent, credible evidence supports the trial court's finding that Scott did not prove that Deputy Allen misled the issuing judges about the comparison houses. With respect to the comparison houses, the trial court found that Scott did not present "evidence that is convincing that 189 Pearl was empty or that half of 231 Pearl is vacant, or that it's not consuming electricity in some fashion, even if it is vacant." (Oct. 9, 2019 Tr. at 38-39). The trial court was not "convince[d] * * * that this electrical comparison [was] not fair." (*Id.* at 39).

{¶27} At the suppression hearing, Deputy Allen testified that he selected the comparison houses based on information from the Marion County Recorder's Office showing that the houses were approximately the same size as 552 Pearl Street. (Aug. 30, 2019 Tr. at 96). However, he stated that he did not notice that the records for 231 Pearl Street indicated that it was a duplex. (*Id.*). Deputy Allen testified that he drove by 231 Pearl Street and 189 Pearl Street in February 2019, but he admitted that he did not knock on the door of either house or otherwise verify how many people, if any, lived in the houses. (*Id.* at 95-97, 99, 101). With respect to 231 Pearl Street, Deputy Allen stated that he did not notice that there were two electric meters attached to the house and that he believed that 231 Pearl Street was a single-family home. (*Id.* at 98). Furthermore, he testified that he did not know whether the subpoenaed electrical records for 231 Pearl Street documented the

electricity usage for the entire duplex or whether the records documented the electricity used in only one half of the duplex. (*Id.* at 97). Finally, with respect to 189 Pearl Street, Deputy Allen testified that, although the property appeared overgrown, "[i]t did not appear vacant" and that he assumed that it was occupied. (*Id.* at 99-101).

{¶28} In addition, Thomas Burton ("Burton"), one of Scott's friends, testified that he was familiar with 231 Pearl Street and 189 Pearl Street. Burton stated that he knew the family that lived at 231 Pearl Street and that, from his familiarity with the family, he knew that 231 Pearl Street was a duplex. (Sept. 26, 2019 Tr. at 59-61). In addition, he testified that 189 Pearl Street "looks like an abandoned house" and that "as long as [he has] lived in Marion, it's always been like * * * the creepy old cat lady house * * *." (*Id.* at 64-65). He noted that the yard at 189 Pearl Street was "overgrown and unkempt, like you would expect from an abandoned house." (*Id.* at 68).

{¶29} Furthermore, Burton identified a series of photographs of 231 Pearl Street and 189 Pearl Street that he took in June 2019. (*Id.* at 58, 60); (Defendant's Exs. 18-29). Defendant's Exhibits 18-21, which depict 231 Pearl Street, show that 231 Pearl Street has two electric meters, two mailboxes, and numerous access doors, all of which are clearly visible from the street. Defendant's Exhibits 22-29, which depict 189 Pearl Street, show overgrown grass, bushes, and trees as well as some

paper trash accumulated on the front porch. Burton testified that when he took the pictures of 189 Pearl Street, he knocked on the door but no one answered. (Sept. 26, 2019 Tr. at 66). However, he admitted that because he never went inside of 189 Pearl Street, he did not know whether the air conditioning or heat were running while he was there or whether the house was supplied with electricity. (*Id.* at 75-77). Moreover, Burton acknowledged that, although the yard at 189 Pearl Street was poorly maintained, the walls and roof were not "falling in." (*Id.* at 75).

{¶30} After reviewing the evidence presented at the suppression hearing, we conclude that competent, credible evidence supports the trial court's findings. First, Scott failed to demonstrate that 189 Pearl Street was vacant. At most, Scott proved that the yard at 189 Pearl Street was not ideally cared for and that he and others, like Burton, regarded the house as vacant based on its appearance. Furthermore, while we believe that Scott established that 231 Pearl Street is a duplex, Scott failed to prove that the subpoenaed electrical records inaccurately represented the total amount of electricity used at 231 Pearl Street. As noted by the trial court, "[t]here was no testimony about whether both meters are operational," it is "unclear * * * from the testimony whether that duplex is completely occupied by [Burton's acquaintance] or whether or not the other half of it is simply empty," and there was "no testimony as to what the square footage split of the house is." (Oct. 9, 2019 Tr. at 37-38). Thus, we agree with the trial court that Scott did not present evidence

sufficient to prove that 189 Pearl Street was vacant or that the subpoenaed records inaccurately reflected the total electricity usage at 231 Pearl Street. Accordingly, this case is distinguishable from other cases in which courts found that the defendant presented evidence sufficient to prove that the comparison properties were so unlike the target property that the comparison was misleading and should not have been relied on to determine probable cause. *See, e.g.*, *State v. Bryant*, 5th Dist. Holmes Nos. 10CA019 and 10CA020, 2011-Ohio-3353, ¶ 7, 32 (averment in affidavit indicating that the target residence used more electricity as compared to neighboring properties was reckless because "the evidence presented revealed * * * [that there was no] information regarding the square footage of, or types of, [the comparison] buildings," one of which was a freezer barn).

{¶31} Finally, the three affidavits each contain a paragraph summarizing the training, experience, and qualifications of Agent Webb of the Ohio Bureau of Criminal Investigation ("BCI"). As Deputy Allen did not have experience with thermal-imaging devices, Deputy Allen worked with Agent Webb "for the use of [BCI's] thermal imagery equipment and their certifications for said equipment." (Defendant's Exs. 7, 10, 13). Deputy Allen stated that "Agent Webb is certified as a law enforcement thermographer with training and experience utilizing thermal imaging equipment in the investigation of indoor marijuana grow operations." (Defendant's Exs. 7, 10, 13). Moreover, according to Deputy Allen, Agent Webb

"has conducted numerous investigations of indoor and outdoor marijuana grow operations that have led to arrests, indictments and convictions." (Defendant's Exs. 7, 10, 13).

{¶32} Scott argues that Deputy Allen falsely claimed that Agent Webb is a certified law-enforcement thermographer because Agent Webb "did not claim to be certified at all as a thermographer * * * [and] said he was unaware of any continuing education requirements that a thermographer had to meet." (Appellant's Brief at 12). Scott notes that Agent Webb "said he was unaware of the different levels of certification that a thermographer could reach" and that Agent Webb took only a "24 hour course * * * on thermal imaging in 2013" and a seminar at which it was mentioned that thermal imaging could be used to detect the presence of an indoor marijuana growing operation. (Id.).

{¶33} We are not persuaded. Scott's argument is premised on the testimony of R. James Seffrin ("Seffrin"), a "certified infrared thermographer." (Aug. 30, 2019 Tr. at 125). Seffrin testified that the company that he owns and leads, Infraspection Institute, offers four levels of certification in thermography: Level I, Level II, Level III, and Master. (Id. at 126-127). However, Seffrin did not testify that the certifications offered through his company are the sole certifications available to thermographers generally or to law-enforcement thermographers specifically. Moreover, it is undisputed that Agent Webb completed a 24-hour

training course put on by the Law Enforcement Thermographer's Association and that he attended another course that touched on the use of thermal imaging in criminal investigations. (Aug. 30, 2019 Tr. at 19-20); (Defendant's Ex. 1). In addition, Agent Webb testified that he had used thermal-imaging devices in approximately 30 investigations over 6 years. (Aug. 30, 2019 Tr. at 21-22). Therefore, while Agent Webb might not have possessed any of the certifications available through Seffrin's company, the record does not support that Deputy Allen intentionally or recklessly misrepresented Agent Webb's certifications or experience with the use of thermal-imaging devices in the investigation of indoor marijuana growing operations.

{¶34} Next, we consider the second category of statements: statements specific to the affidavit used to support Deputy Allen's request for authorization to scan 552 Pearl Street with a thermal-imaging device. This affidavit features various paragraphs explaining that a "thermal image evaluation" might provide information that could "corroborate other information developed in this investigation that is indicative of an indoor marijuana growing operation." (Defendant's Ex. 7). Furthermore, in these paragraphs, which were part of the existing template Deputy Allen used to draft his affidavit, Deputy Allen attempted to provide a brief explanation of the scientific principles underlying thermal imaging. (*Id.*). He also stated that "thermal imaging equipment is a valuable tool for law enforcement in

conducting indoor marijuana growing investigations." (*Id.*). Finally, Deputy Allen tried to explain how a thermal-imaging device functions and what might be discovered by scanning 552 Pearl Street with a thermal-imaging device. (*Id.*).

{¶35} Scott's arguments about the alleged falsehoods and inaccuracies in these paragraphs are elaborate and numerous. Basically, Scott argues that (1) Deputy Allen falsely claimed that the results of a thermal-imaging scan could provide probative evidence of an indoor marijuana growing operation; (2) Deputy Allen inaccurately described the science of heat transfer and thermal imaging and the capabilities of thermal-imaging devices; and (3) Deputy Allen misrepresented the conditions of an indoor marijuana growing operation in a way that created "an unreasonable expectation * * * as to * * * the conditions [a thermal-imaging device] can detect." (Appellant's Brief at 12-17).

{¶36} We cannot find merit in any of Scott's arguments. First, we flatly reject Scott's claim that a thermal-imaging scan could not have produced probative evidence of indoor marijuana cultivation. Scott suggests that thermal imaging might be probative if "there was a flyover of an old barn in the middle of nowhere emitting * * * infrared * * * radiation" but that it would not be probative with respect to a "thermal flyover of a house that will, like all houses, be emitting invisible infrared radiation * * *." (Appellant's Brief at 14). However, although the former type of thermal-imaging scan might produce stronger evidence of indoor marijuana

-25-

cultivation, this does not mean that the latter type of scan cannot produce any evidence of marijuana cultivation. In addition, Scott has failed to cite to any case in which a court has concluded that thermal imaging cannot provide probative evidence of indoor marijuana cultivation, and our independent research has not uncovered any such case. While we agree with Scott that a thermal-imaging scan cannot itself produce conclusive evidence of indoor marijuana cultivation, we are of the opinion that the results of a thermal-imaging scan do have some probative value and that, even if the value of such results is limited, they can be appropriately considered by a judge in determining whether the totality of the circumstances supports the issuance of a search warrant.

{¶37} Furthermore, we cannot conclude that Deputy Allen's statements about the science of thermal imaging, the capabilities of thermal-imaging devices, and the conditions of an indoor marijuana growing operation were so erroneous as to mislead the issuing judge. For these arguments, Scott again relies on Seffrin's expertise in thermal imaging. Throughout his testimony and in his expert report, Seffrin described many instances where he believed that Deputy Allen either inaccurately characterized the science of thermal imaging, gave a false impression of the capabilities of thermal-imaging devices, or misrepresented the conditions associated with an indoor marijuana growing operation. (*See* Aug. 30, 2019 Tr. at 125-172); (*See* Defendant's Ex. 35). However, after reviewing Seffrin's testimony

and expert report, in which he offers "correct" explanations of the science of thermal-imaging, the capabilities of thermal-imaging devices, and the conditions associated with an indoor marijuana grow, we find that Deputy Allen's statements were not so at odds with the "correct" explanations as to render them materially misleading. We are mindful that Deputy Allen is not a scientist; he is a law enforcement officer who was writing for an audience trained in the law rather than in the science of heat transfer and thermography. While Deputy Allen's descriptions likely would not qualify him for publication in a scientific journal or for a job writing technical manuals, they were accurate enough to give the issuing judge a general understanding of the subject matter and, therefore, accurate enough for purposes of obtaining a search warrant. Moreover, even if they were not sufficiently accurate, there is no indication that Deputy Allen knew or should have known that he was misrepresenting this information or that Deputy Allen omitted more-accurate descriptions with an intention to mislead the issuing judge.

{¶38} Lastly, we consider the third category of statements: statements common to the affidavits for 552 Pearl Street and 354 Chestnut Street or specific to the affidavit for 354 Chestnut Street. The search-warrant affidavits for 552 Pearl Street and 354 Chestnut Street both contain a paragraph relaying the results of the thermal-imaging scan conducted on March 1, 2019. This paragraph provides:

On February 28, 2019[,] a search warrant for a thermal imaging device was signed by Judge Brent Rowland and on March 01, 2019[,] a thermal imaging device was used to check the temperature levels at 552 Pearl Street. During this search warrant[,] the house appears to be consistent with a marijuana growing operation.

(Defendant's Exs. 10, 13).

{¶39} Scott argues that, in this paragraph, Deputy Allen falsely claimed that a thermal-imaging device was used to detect temperature levels because, according to Seffrin, "thermal imaging equipment is incapable of measuring temperatures." (Appellant's Brief at 21). He maintains that thermal-imaging devices instead "detect[] invisible heat radiation emitted from an object * * *." (*Id.*). Scott also claims that Deputy Allen intentionally or recklessly misled the court because "Seffrin says it is impossible to say a house can appear as a location of an indoor marijuana growing operation as there 'is no single thermal pattern that is consistent with indoor marijuana cultivation for any structure.'" (*Id.*).

{¶40} Both of these arguments are unpersuasive. As with Deputy Allen's other descriptions of the science of thermal imaging and the capabilities of thermal-imaging devices, we do not believe that Deputy Allen's statements were so incorrect as to mislead the issuing judge. While perhaps not entirely accurate, Deputy Allen's statement was more than sufficient to give the reviewing judge a working

understanding of the thermal-imaging scan that was performed on March 1, 2019, and in any event, there is no evidence that Deputy Allen knew or should have known that the thermal-imaging device detected "invisible heat radiation" rather than "temperature levels."

{¶41} In addition, despite Seffrin's disagreement with the conclusion that the results of the thermal-imaging scan were consistent with an indoor marijuana growing operation, a conclusion conveyed to Deputy Allen by Agent Webb, Scott has failed to carry his burden of demonstrating that this statement was included in the affidavits as a result of Deputy Allen's deliberate falsehood or reckless disregard for the truth. First, we are not convinced that Scott actually proved that this statement was false. During his testimony, Seffrin admitted that "[t]hermal imaging requires interpretation of the data which in and of itself is subjective at some level." (Aug. 30, 2019 Tr. at 170). He also stated that it is possible for people to interpret thermal-imaging results differently, though he suggested that differing interpretations result from inadequate training. (Id.). Thus, Seffrin's testimony leaves open the possibility that Agent Webb's findings were a reasonable interpretation of the data, notwithstanding Seffrin's disagreement.

{¶42} Regardless, even if Agent Webb's conclusions were incorrect, what matters is whether Deputy Allen knew or had reason to know that Agent Webb's conclusions were wrong when he included them in the affidavits. Nothing in the

record indicates that Deputy Allen knew that Agent Webb's conclusions were inaccurate or that Deputy Allen had any cause to question the soundness of those conclusions. Accordingly, we find no fault in Deputy Allen's decision to accept Agent Webb's conclusions as truthful. *See United States v. Lonardo*, W.D.N.Y. No. 10-cr-6226, 2012 WL 3685958, *5 (June 27, 2012). Moreover, under these circumstances, Deputy Allen was not required to verify Agent Webb's findings by conducting his own independent investigation or consulting another expert before including Agent Webb's findings in the affidavits. *See id.*, citing *United States v. Harding*, 273 F.Supp.2d 411, 428 (S.D.N.Y.2003).

{¶43} Finally, the search-warrant affidavit for 354 Chestnut Street contains three paragraphs that do not appear in the other two affidavits. These paragraphs provide:

21. Throughout the time that I[, Deputy Allen,] have been investigating Jeremy Scott[,] I have been able to observe him coming and going from 354 Chestnut Street. His vehicle is a silver Mercedes * * * [and] the registration on this vehicle returns to the address of 354 Chestnut Street. Jeremy Scott's Ohio driver's license also returns to 354 Chestnut Street. The bills for Jeremy's electricity were subpoenaed and it was found that he has electricity bills at both 552

Pearl Street and 354 Chestnut Street that come in his name through Ohio Edison.

22. I spoke with Detective Matt Baldridge whom advised me he had gotten a tip from Jamie Ernst about Jeremy having marijuana at his residence on Chestnut Street. Jamie who was in a relationship with Jeremy Scott years ago has a daughter with Jeremy * * *. Jamie stated that [their daughter] had sent her photos of the marijuana, and she forwarded them to us on December 29, 2019 [sic]. I reviewed the photos and with my training and experience it appeared to be a plastic red tub full of marijuana clippings. I was advised that the tub was in a locked closet that was in the kitchen at Jeremy's residence on Chestnut Street.

23. Due to previous tips stating that Jeremy has been seen going in and out of Chestnut Street with a backpack in the past and a recent tip with Jeremy being traffic stopped and in possession of grow equipment as well as photos from his daughter that show marijuana clippings in the residence it is suspected that Jeremy is taking the marijuana that he is growing from 552 Pearl Street and keeping it and other related items at 354 Chestnut Street.

(Defendant's Ex. 10).

{¶44} Scott attacks each of these paragraphs, and we begin with Scott's arguments concerning paragraph 22. Scott argues that this paragraph is false or misleading for the following reasons: (1) "There were not photos in as plural or many, but only one photo"; (2) "Allen said in the affidavit that the tub was locked in a closet in the kitchen" but "the photo shows the tub out in the open in a room which appeared not to be a kitchen"; (3) the photograph depicting the tub full of vegetation might have been doctored; and (4) Deputy Allen "knew he could not honestly say the vegetation [in the photograph] was marijuana or at minimum he was expressing a reckless disregard for the truth as he had doubts in his own mind what the vegetation was." (Appellant's Brief at 22-23).

{¶45} We can quickly dispose of Scott's first two arguments. Although Scott is technically correct that paragraph 22 is inaccurate insofar as Deputy Allen had only one photograph to review, Scott has not shown that these pluralizations were anything more than innocent misstatements on Deputy Allen's part. What is more, to fault Deputy Allen for his imprecision would be to engage improperly in a "hypertechnical" construction of the search-warrant affidavit. *See State v. Hobbs*, 4th Dist. Adams No. 17CA1054, 2018-Ohio-4059, ¶ 27 ("[R]eviewing courts must refrain from interpreting search-warrant affidavits '"in a hypertechnical, rather than a commonsense, manner."'"), quoting *Gates*, 462 U.S. at 236, quoting *Ventresca*, 380 U.S. at 109. In addition, Scott has not demonstrated that Deputy Allen knew

that the picture did not portray the kitchen closet or that Deputy Allen believed that the photograph did not depict what it purported to depict.

{¶46} Furthermore, with respect to Scott's third argument, even assuming that the photograph was doctored, Scott has failed to establish that Deputy Allen knew or should have known that the photograph had been modified. Because Deputy Allen had not been inside of 354 Chestnut Street at any time before he requested the search warrant, he did not know what the room depicted in the photograph actually looked like. Deputy Allen received information suggesting that the photograph was taken from inside a kitchen closet at 354 Chestnut Street, and we believe that it was reasonable for him to rely on that information. Moreover, although there are clear differences between the room as depicted in the photograph used by Deputy Allen and the room as depicted in photographs taken after the search warrant was executed, there are no obvious signs of doctoring in the photograph relied on by Deputy Allen. (*See* Defendant's Exs. 16, 17).

{¶47} Scott's fourth argument, however, warrants slightly more attention. To support this argument, Scott points to the testimony of Dr. Hannah Mathers ("Dr. Mathers"), who was qualified as an expert in plant identification. (Sept. 26, 2019 Tr. at 14). At the suppression hearing, Dr. Mathers stated that she examined Defendant's Exhibit 16, the photograph used by Deputy Allen, to determine whether the vegetation contained in the tub portrayed in the photograph was marijuana. Dr.

Mathers testified that "due to the quality of the picture, [it was] really difficult to identify [the vegetation]." (*Id.* at 28). Nevertheless, Dr. Mathers concluded that there were "no distinguishing characteristics in [Defendant's Exhibit 16] to identify [the vegetation] as cannabis." (*Id.*).

{¶48} Based on Dr. Mathers's testimony, the trial court stated that it "certainly h[ad] * * * doubts * * * as to whether or not what is in Defendant's Exhibit 16 is marijuana or not," though it did not definitively find that the vegetation depicted in Defendant's Exhibit 16 is not marijuana. (Oct. 9, 2019 Tr. at 35-36). After reviewing Defendant's Exhibit 16 and Dr. Mathers's testimony, we share the trial court's doubts. Therefore, although we cannot make the initial finding that Defendant's Exhibit 16 does not depict marijuana, we will assume for the sake of Scott's argument that it does not depict marijuana.

{¶49} Yet, as noted by the trial court, "the question isn't really about * * * what is actually in the picture. It's [about] what a reasonably trained officer or affiant would believe it is." (*Id.* at 35). "[T]he requirement that an affiant be truthful in an application for a search warrant does not mean that every fact stated in the application is correct." *Lonardo*, 2012 WL 3685958, at *5. Although an affiant must be truthful,

> [t]his does not mean "truthful" in the sense that every fact recited in
> the warrant affidavit is necessarily correct, for probable cause may be

-34-

founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks*, 438 U.S. at 165.

**{¶50}** Here, there is absolutely no evidence that Deputy Allen knew that Defendant's Exhibit 16 did not depict marijuana when he executed the affidavit for 354 Chestnut Street. Nor is there any evidence that Deputy Allen had serious doubts about whether the photograph portrayed marijuana when he submitted the affidavit. At a quick glance, one could certainly mistake the vegetation in Defendant's Exhibit 16 for marijuana clippings, and coupled with the tip that Scott was keeping marijuana at 354 Chestnut Street, it was not manifestly unreasonable for Deputy Allen to believe, in light of his training and experience, that Defendant's Exhibit 16 appeared to depict some of the marijuana referred to in the tip. Moreover, while consultation with an expert such as Dr. Mathers could have aided Deputy Allen in determining whether Defendant's Exhibit 16 did in fact depict marijuana clippings, we cannot say that Deputy Allen's failure to do so was reckless. Therefore, we conclude that competent, credible evidence supports the trial court's determination

that Deputy Allen did not knowingly or recklessly mislead the issuing judge with respect to Defendant's Exhibit 16.

{¶51} Finally, while Scott contends that there are problems with paragraphs 21 and 23 of the affidavit for 354 Chestnut Street, his arguments are unavailing. For the most part, Scott simply rehashes arguments that he made previously, such as that these paragraphs are partly false because Deputy Allen actually reviewed only one photograph, rather than multiple photographs, and that the police report from the January 2019 traffic stop did not mention that a grow light and amplifier were discovered in the vehicle. Having already rejected these arguments, we need not consider them again. Scott's other arguments do not so much assert that these paragraphs contain false information as claim that they describe innocent, noncriminal behaviors that cannot contribute to a finding of probable cause. However, "innocent behavior frequently will provide the basis for a showing of probable cause * * *." *Gates*, 462 U.S. at 243, fn. 13. "The relevant inquiry when examining the totality of the circumstances supporting probable cause 'is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.'" *State v. Schlick*, 8th Dist. Cuyahoga No. 77885, 2000 WL 1803216, *4 (Dec. 7, 2000), quoting *Gates* at 243, fn. 13. Thus, the fact that these paragraphs describe conduct that might appear

innocent when viewed in isolation does not alone preclude a finding of probable cause or provide a basis for invalidating the warrant.

{¶52} To summarize the foregoing, we conclude that competent, credible evidence supports the trial court's finding that Deputy Allen did not knowingly and intentionally, or with reckless disregard for the truth, include false statements in any of the search-warrant affidavits. Yet, despite this conclusion, we must still determine whether the search-warrant affidavits contain information sufficient to support the issuing judges' probable-cause determinations. This requires us to address Scott's argument that the information contained in the search-warrant affidavits is too stale to support findings of probable cause.

{¶53} "An affidavit in support of a search warrant must present timely information and include facts so closely related to the time of issuing the warrant as to justify a finding of probable cause at that time." *State v. Maranger*, 2d Dist. Montgomery No. 27492, 2018-Ohio-1425, ¶ 36, citing *State v. Jones*, 72 Ohio App.3d 522, 526 (6th Dist.1991). "'The more "stale" the evidence becomes, the less likely it is to support probable cause.'" *State v. Morales*, 10th Dist. Franklin No. 17AP-807, 2018-Ohio-3687, ¶ 19, quoting *State v. Ridgeway*, 4th Dist. Washington No. 00CA19, 2001 WL 1710397 (Nov. 21, 2001). However, "[n]o arbitrary time limit dictates when information becomes 'stale.'" *Maranger* at ¶ 36, citing *Jones* at 526. Rather, "'[t]he test for staleness is whether the alleged facts

justify the conclusion that contraband is probably on the person or premises to be searched at the time the warrant issues.'" *Morales* at ¶ 19, quoting *State v. Ingold*, 10th Dist. Franklin No. 07AP-648, 2008-Ohio-2303, ¶ 22 and citing *State v. Rieves*, 8th Dist. Cuyahoga No. 105386, 2018-Ohio-955, ¶ 31.

{¶54} "'The question of staleness is not measured solely by counting the days between the events listed in the affidavit and the application for warrant.'" *Id.* at ¶ 20, quoting *Ingold* at ¶ 23. "'Ohio courts have identified a number of factors to consider in determining whether the information contained in an affidavit is stale, including the character of the crime, the criminal, the thing to be seized, as in whether it is perishable, the place to be searched, and whether the affidavit relates to a single isolated incident or ongoing criminal activity.'" *Id.*, quoting *Ingold* at ¶ 23 and citing *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir.2010). "The question of staleness, then, depends on the 'inherent nature of the crime.'" *United States v. Thomas*, 605 F.3d 300, 309 (6th Cir.2010), quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir.1988). "A marijuana growing operation, which is a long-term operation, may allow for greater lapses of time between the information relied upon and the request for a search warrant." *Id.* at 310, citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir.1991) and *United States v. Thomas*, 6th Cir. Nos. 92-6207 and 92-6208, 1993 WL 337553, *3 (Aug. 31, 1993). This is at least in part due to the fact that the items used in the cultivation of

marijuana are "likely to be in service for several years" and "possess[] enduring worth and utility." *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir.1996), citing *United States v. McKeever*, 5 F.3d 863, 866 (5th Cir.1993) and *United States v. Sturmoski*, 971 F.2d 452, 457 (10th Cir.1992).

{¶55} Furthermore, "'[w]here recent information corroborates otherwise stale information, probable cause may be found.'" *United States v. Spikes*, 158 F.3d 913, 924 (6th Cir.1998), quoting *Henson* at 1381-1382. That is, stale information may be "refreshed" when law enforcement officers acquire "newer information that relates back to the subject of the older information." *United States v. Cintron*, 243 Fed.Appx. 676, 679 (3d Cir.2007), citing *United States v. Tehfe*, 722 F.2d 1114, 1120 (3d Cir.1983).

{¶56} Here, we have little doubt that if law enforcement officers had sought search warrants in 2015 based solely on pre-2019 information, a judge could have easily found that there was probable cause both to scan 552 Pearl Street with a thermal-imaging device and to search inside 552 Pearl Street and 354 Chestnut Street for evidence of a marijuana growing operation. With the exception of the information about Scott's possession of marijuana in September 2000, which is of minimal probative value given Scott's age at the time, 15, and its distant relation in time to the other information in the affidavits, the three affidavits document that from 2008 through 2015, law enforcement officers received a steady stream of tips

connecting Scott to a marijuana cultivation and trafficking operation based out of 552 Pearl Street and 354 Chestnut Street. Many of these tips came from anonymous informants, who are generally less reliable, and from identified informants who, according to Scott, were not disinterested and had a motive to fabricate their allegations. However, these tips corroborated one another to some degree, and in any event, law enforcement officers independently corroborated the tips when evidence of marijuana cultivation was discovered in the vehicle that Scott was driving in 2010 and in the trash at 552 Pearl Street in 2015. Thus, we believe that, at least in 2015, there would have been more than enough evidence to support the issuance of the three search warrants at issue in this case.

{¶57} Yet, law enforcement officers did not seek these warrants in 2015. Instead, it was not until 2019, when law enforcement officers received new information suggesting that Scott was still growing marijuana, that Deputy Allen requested the warrants. By the time Deputy Allen requested the search warrants in February and March 2019, the majority of the information contained in the three affidavits was at least 44 months old. Therefore, assuming that the pre-2019 information became stale during this period, the critical issue becomes whether the information discovered at or around the beginning of 2019 refreshed the otherwise stale pre-2019 information.

{¶58} Based on the particular circumstances of this case, we believe that the information collected at or near the beginning of 2019 was probably sufficient to refresh the pre-2019 information. The grow light and amplifier discovered in Scott's vehicle during the January 2019 traffic stop demonstrated that Scott had not dispossessed himself completely of the equipment used to cultivate marijuana. Although the presence of a single grow light and amplifier would not likely have been enough to tie Scott's conduct in 2019 to the kind of large-scale marijuana growing operation described throughout the pre-2019 portions of the search-warrant affidavits, the utility records for 552 Pearl Street, which showed an exceptionally high level of electricity usage especially as compared to similarly sized properties, were a much stronger indicator of an ongoing marijuana growing operation. This is true even if we were to accept Scott's claims that 189 Pearl Street was vacant and that 231 Pearl Street was a duplex whose total electricity consumption was not accurately reported in the search-warrant affidavits. For example, if the actual total usage for 231 Pearl Street was triple that of its reported usage, 552 Pearl Street still would have used nearly 12,000 kilowatt hours more than 231 Pearl Street over the relevant period. Thus, even with less-than-perfect comparison houses, the raw electricity-usage data both refreshes the pre-2019 information and serves as corroborating evidence of a continuing marijuana growing operation at 552 Pearl

Street.  *See United States v. Hoang*, 487 Fed.Appx. 239, 242-245 (6th Cir.2012); *Thomas*, 605 F.3d at 310, 310, fn. 9.

**{¶59}** Furthermore, to the extent that the elevated electricity usage at 552 Pearl might be accounted for in another way, the fact that the results of the thermal-imaging scan were consistent with indoor marijuana growing suggested that Scott had at least restarted the marijuana growing operation, if he had ever suspended it. Finally, the tip that indicated that Scott was storing marijuana at 354 Chestnut Street served to renew the link between 552 Pearl Street and 354 Chestnut Street and suggested that Scott was still using multiple locations to run a marijuana growing operation.

**{¶60}** Ultimately, however, we need not definitively resolve the question of staleness because, even if the information in the affidavits were too stale to support findings of probable cause, suppression would not be appropriate.  "The exclusionary rule should not bar the use of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate even if that warrant is ultimately found to be unsupported by probable cause." *State v. Reece*, 3d Dist. Marion No. 9-17-27, 2017-Ohio-8789, ¶ 17, citing *George*, 45 Ohio St.3d at 325, citing *Leon*, 468 U.S. 897.  Nevertheless, the good-faith exception is inapplicable and suppression is still appropriate

where the magistrate or judge who issued the warrant was misled by information in the affidavit that the affiant knew was false or would have known was false if not for reckless disregard of the truth, where the magistrate wholly abandoned his judicial function in issuing the warrant, where the affidavit is "so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable," or where the warrant is so facially deficient that officers cannot reasonably presume its validity.

*Id.*, quoting *George* at 331, citing *Leon* at 923.

**{¶61}** In this case, there is neither argument nor evidence that the issuing judges wholly abandoned their judicial functions. Furthermore, the warrants are not so facially deficient that the executing officers could not reasonably presume their validity, and we have already concluded that the evidence does not support that the issuing judges were misled by information in the affidavits that Deputy Allen knew was false or would have known was false if not for reckless disregard of the truth. Therefore, the applicability of the good-faith exception turns on whether the search-warrant affidavits contain sufficient indicia of probable cause.

**{¶62}** We conclude that because the search-warrant affidavits contain more than sufficient indicia of probable cause, the good-faith exception applies regardless of whether the information in the affidavits is otherwise too stale to support findings

of probable cause. Each of the three affidavits contains information, collected over many years, that connected Scott to a fairly large-scale, longstanding marijuana growing operation. Much of this information came from people who were relatively close to Scott, and although it is alleged that these people had reason to fabricate their tips, the information received from these informants was consistent with information received from anonymous informants and consistent over time. To the extent that any of these tips were unreliable, they were corroborated when evidence of marijuana cultivation was discovered in Scott's trash and in his vehicle during the 2010 traffic stop. As for the information received around the beginning of 2019, the electricity-usage records for 552 Pearl Street, the results of the thermal-imaging scan, and the tip stating that Scott was storing marijuana at 354 Chestnut Street are, when considered with other information received in 2019, relatively strong evidence that Scott was still running a marijuana growing operation out of 552 Pearl Street and 354 Chestnut Street. Although a considerable period of time elapsed between the receipt of most of the information contained in the affidavits and Deputy Allen's requests for the search warrants, there is a straight line from the pre-2019 information to the information received in 2019. A reasonable law enforcement officer could recognize a direct link between the pre-2019 information and the information received in 2019 and conclude that, based on the information received in 2019, there was a sufficiently high probability that Scott was running the same

marijuana growing operation in 2019 that he was allegedly running in years previous, evidence of which might be discovered inside of 552 Pearl Street and 354 Chestnut Street.

**{¶63}** Scott's assignments of error are overruled.

**{¶64}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**